Thomas DENNEY, R. Thomas Weeks, Norman R. Kirisits, Kathryn M. Kirisits, TD Cody Investments, L.L.C., RTW Investments, L.L.C., NRK Syracuse Investments, L.L.C., DKW Partners, DKW Lockport Investors, Inc., Donald A. Destefano, Patricia J. Destefano, DD Tiffany Circle Investments L.L.C., Tiffany Circle Partners, Diamond Roofing Company, Inc., Jeff Blumin, JB Hilltop Investments L.L.C., Kyle Blumin, KB Hoag Lane Investments, L.L.C., L. Michael Blumin, MB St. Andrews Investments, L.L.C., Fayetteville Partners, and Laurel Hollow Investors, Inc., on their own behalf and on behalf of all others similarly situated, Plaintiffs,

v.

JENKENS & GILCHRIST, a Texas Professional Corporation, Jenkens & Gilchrist, an Illinois Professional Corporation, BDO Seidman, L.L.P., Pasquale & Bowers, L.L.P., Cantley & Sedacca, L.L.P., Dermody, Burke, and Brown, Certified Public Accountants, PLLC, Paul M.

Daugerdas, Paul Shanbrom, Edward Sedacca, Deutsche Bank AG, and Deutsche Bank Securities, Inc., d/b/a Deutsche Bank Alex Brown, a Division of Deutsche Bank Securities, Inc., Defendants.

No. 03 Civ. 5460(SAS).

United States District Court, S.D. New York.

Feb. 18, 2005.

See, also, 2004 WL 2997930.

David R. Deary, W. Ralph Canada, Shore & Deary, L.L.P., Dallas, Texas, Jeffrey Daichman, Nahum Kainovsky, Kane Kessler, P.C., New York City, Joe R. Whatley, Jr., Othni Lathram, Whatley Drake, L.L.C., Birmingham, Alabama, Ernest Cory, Cory Watson Crowder & Degaris, P.C., Birmingham, Alabama, Stephen F. Malouf, Dallas, Texas, for Plaintiffs.

Larry Black, Austin, Texas, for Defendants Paul Daugerdas, Erwin Mayer, and Donna Guerin.

Rod Phelan, Baker Botts, L.L.P., Dallas, Texas, for Defendant Jenkens & Gilchrist, P.C.

H. Lamar Mixson, Alison Berkowitz Prout, Bondurant, Mixson & Elmore, L.L.P., Atlanta, Georgia, Steven Spielvogel, Gallion & Spielvogel, Garden City, New York, for Plaintiffs Eric Harslem, Lorraine Clasquin, Douglas MacGregor, Jeffrey Clarke and Loretta Clarke.

Philip E. Bryant, Boyer & Ketchand, Houston, Texas, for Plaintiffs Denis Hoasjoe and Robert Moore.

Robert J. Clary, Owens, Clary & Aiken, L.L.P., Dallas, Texas, for Plaintiffs James Mattei and J. Scott Mattei.

Lawrence M. Hill, Seth C. Farber, Dewey Ballantine, L.L.P., New York City, for Defendants Deutsche Bank AG and Deutsche Bank Securities.

Michael R. Young, Michelle Nadel, Brian A. Turetsky, Willkie Farr & Gallagher, New York City, for Defendants BDO Seidman and Paul Shanbrom.

Shirah Neiman, Justin S. Weddle, Assistant United States Attorneys, Southern District of New York, New York City, for the Government.

## OPINION & ORDER

SCHEINDLIN, District Judge.

### I. INTRODUCTION

Plaintiffs allege in this putative class action that defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO") and are liable for damages and other relief arising from unjust enrichment, breach of contract, breach of the duty of good faith and fair dealing, breach of fiduciary duties, fraud, negligent misrepresentation, professional malpractice, unethical, excessive and illegal fees, and conspiracy.[1] On May 14, 2004, the Court preliminarily certified a settlement class and approved a proposed settlement with defendants Jenkens & Gilchrist, P.C., Paul Daugerdas, Erwin Mayer and Donna Guerin (collectively, "Jenkens").[2]

Lead Plaintiffs now seek final approval of the settlement and certification of the class, and entry of a proposed final judgment. Lead Counsel seek an award of attorney's fees and expenses for their efforts.[3] On January 24, 2005 the Court held a hearing on the fairness of the settlement. Having considered all objections, a class is hereby certified and the settlement is approved in a separate Order issued today. This opinion explains the decision to certify the class and approve the settlement.

### II. BACKGROUND

#### A. The Alleged Conspiracy

This case arises out of tax and consulting services offered by several professional law and accounting firms. In their Second Amended Complaint, the Denney Plaintiffs

---

1. *See* Second Amended Complaint. Lead Plaintiffs in this action, acting on behalf of themselves and all others similarly situated, include: Thomas Denney, R. Thomas Weeks, Norman Kirisits, Kathryn M. Kirisits, NRK Syracuse Investments, L.L.C., RTW High Investments, L.L.C., TD Cody Investments, L.L.C., DKW Lockport Investments, Inc., DKW Partners, Donald A. DeStefano, Patricia J. DeStefano, DD Tiffany Circle Investments, L.L.C., Tiffany Circle Partners, Diamond Roofing Company, Inc., Jeff Blumin, Kyle Blumin, L. Michael Blumin, JB Hilltop Investments, L.L.C., KB Hoag Lane Investments, L.L.C., MB St. Andrews Investments, L.L.C., and Laurel Hollow Investors, Inc. (collectively, the "Denney Plaintiffs"). In addition, in connection with this settlement, both the plaintiffs in the case of *Camferdam v. Jenkens & Gilchrist,* No. 02 Civ. 10100 (S.D.N.Y.) (Henry N. Camferdam, Jeffrey M. Adams, Jay Michener, and Carol Trigilio (collectively, the "Camferdam Plaintiffs")) and Jack Riggs, plaintiff in *Jack Riggs v. Jenkens & Gilchrist,* No. 03–6291–C (Co.Ct.Dallas, Tex.) have appeared in this action as additional class representatives. *Denney* and *Camferdam* are class actions; *Riggs* is not.

2. The Class is defined as follows: all Persons who, from January 1, 1999, through December 31, 2003, inclusive, either (1) consulted with, relied upon, or received oral or written opinions or advice from Jenkens & Gilchrist or any Jenkens & Gilchrist attorney concerning any one or more of the Tax Strategies and who in whole or in part implemented, directly or indirectly, any one or more of the Tax Strategies or (2) filed with a Person described in (1) a joint tax return for the year(s) in which such Tax Strategy was implemented, and (3) the legal representatives, heirs, successors, and assigns of all Persons described in (1) and (2). The Class includes, without limitation, the individuals, partnerships, limited liability companies, trusts, corporations and

other legal entities that Jenkens & Gilchrist or any Jenkens & Gilchrist attorney advised concerning, that were formed in connection with, or that engaged or were utilized in any one or more of the Tax Strategies. The Class excludes, however, any Persons described in (1), (2) and (3) who timely elected to be excluded from the Class and did not later timely revoke that election.

The "Tax Strategies" are defined as: those tax-reducing strategies that are the basis of the *Denney, Camferdam* and *Riggs* suits, as well as all other tax-reducing strategies advised upon or opined about by any of the J & G Defendants involving (a) basis-enhancing investment transactions, (b) basis-enhancing derivatives structure, (c) basis leveraged investment swap spreads, (d) hedge option monetization of economic remainders, (e) basis adjustment remainder trust, (f) gain option partnerships, or (g) other basis-enhancing, basis-preserving, and/or gain-avoidance transactions utilizing options and/or indebtedness and involving corporations and/or partnerships.

The "J & G Defendants" are defined as: Jenkens & Gilchrist and all Persons (including Daugerdas, Mayer and Guerin) who, during all or any part of the period January 1, 1998, to date, held the status of director, officer, stockholder, partner, principal, member, owner and/or employee in any of the entities comprising Jenkens & Gilchrist (whether or not any such Person has been sued).

3. The Denney and Camferdam Plaintiffs are represented by the firms of Deary Montgomery DeFeo & Canada, LLP ("DMDC"), Whatley Drake LLC ("Whatley Drake"), Cory Watson Crowder & DeGaris, P.C. ("Cory Watson"), and Kane Kessler, P.C. ("Kane Kessler"). Jack Riggs is represented by the firm of Stephen F. Malouf, P.C. ("Malouf").

allege that, in the mid–1990's, Jenkens, in concert with Deutsche Bank[4] and others, developed a tax shelter strategy based on the purchase of foreign currency options. The strategy, sometimes with minor variations, was marketed under various names, including "Currency Options Bring Reward Alternatives," or COBRA. The gravamen of plaintiffs' allegations is that Jenkens, and the other defendants, knew that the tax strategies lacked economic substance and would be held invalid by the IRS, but falsely held them out to plaintiffs as legitimate.

The Denney Plaintiffs allege that Jenkens and Deutsche Bank recruited a number of accounting firms (the "Marketing Participants") to market the tax strategies to their clients. The Marketing Participants included, *inter alia,* BDO[5] and Ernst & Young. Once the Marketing Participants identified a suitable client, they would arrange a meeting to present the tax strategy to the client.

At these presentations, plaintiffs allege, the Marketing Participants would represent that the tax strategy was "legitimate and in accordance with all applicable tax laws, rules, and regulations [and] was not a 'sham transaction' that would be ignored or disallowed for tax purposes."[6] The Marketing Participants further represented that the tax strategy was devised by them, not by Jenkens. "The crux of the sales pitch was always that a major law firm, Jenkens & Gilchrist, would prepare an 'independent' opinion letter confirming the propriety of the [tax strategy], which would supposedly provide insurance in the event of an audit."[7] Plaintiffs allege that Jenkens was not, in fact, able to provide a truly "independent" opinion letter, but could provide only "a pre-fabricated and canned

legal opinion confirming the propriety of their own tax strategy."[8] Plaintiffs allege that Jenkens charged excessive and unreasonable fees for its advice and opinion letters.

Essentially these same representations were allegedly made to all members of the class. After plaintiffs entered and completed the tax shelter transactions, Jenkens provided them with an opinion letter attesting to the legitimacy of the tax strategies.[9] These opinion letters were substantially identical.

## B. The Denney Plaintiffs

The Denney Plaintiffs were introduced to COBRA by their accountants, the small firm of Pasquale & Bowers, who had been recruited by BDO to market COBRA to their clients. Pasquale & Bowers contacted the Denney Plaintiffs regarding COBRA in September 1999. The Denney Plaintiffs subsequently met with the Pasquale Defendants and BDO to discuss the strategy. At the presentation in September 1999, BDO and Pasquale made the representations described above. The Denney Plaintiffs decided to engage in the transaction in October 1999, and retained Jenkens to advise them. With the assistance of Jenkens, the Denney Plaintiffs created various partnerships and limited liability companies for the purpose of carrying out the COBRA transactions. The Denney Plaintiffs entered into the COBRA transactions in November 1999.

Jenkens sent each of the Denney Plaintiffs virtually identical opinion letters in March 2000.[10] The opinion letters advised that the COBRA strategy was legitimate. The Denney Plaintiffs allege that these letters are representative of similar letters provided to all Class Members.[11] In reliance on defen-

4. "Deutsche Bank" refers to Deutsche Bank AG and Deutsche Bank Securities.

5. "BDO" refers to BDO Seidman, LLP and Paul Shanbrom.

6. *Denney* Second Amended Complaint ¶ 99.

7. *Id.* ¶ 85.

8. *Id.* ¶ 86.

9. The class includes not only those who directly received opinion letters from Jenkens, but also those who filed joint returns with such a person, and the partnerships and other entities that were

formed in connection with, or that engaged or were utilized in any one or more of the tax strategies. The definition also includes several dozen taxpayers who consulted Jenkens with respect to the tax strategies, and who began, but did not complete the transactions, and did not receive opinion letters. Jenkens' Memorandum of Law in Support of Class Certification and Approval of the Settlement ("Jenkens Mem.") at 6 n. 4.

10. *See Denney* Second Amended Complaint ¶ 157. One of the Denney Plaintiffs did not receive his opinion letter until September 2000.

11. *See id.* ¶ 157.

dants' representations, the Denney Plaintiffs reported the COBRA transactions on their tax returns for 1999.

## C. The Camferdam and Riggs Plaintiffs

The plaintiffs in *Camferdam* and *Riggs* have appeared in this action as additional class representatives.

The Camferdam Plaintiffs sold their business in 1999, realizing a combined capital gain in excess of $70 million.[12] Ernst & Young, who had for several years provided accounting services to the business and to two of the individual Camferdam Plaintiffs, advised the Camferdam Plaintiffs during the transaction.[13] Shortly after the transaction, Ernst & Young approached the Camferdam Plaintiffs to market the COBRA strategy to them. On November 5, 1999, the Camferdam Plaintiffs attended a presentation by Ernst & Young, at which Ernst & Young allegedly made the above representations with regard to COBRA.[14]

The Camferdam Plaintiffs engaged in the COBRA transactions on November 16, 1999.[15] They subsequently retained Jenkens & Gilchrist to provide opinion letters. . Jenkens sent each plaintiff a substantially identical opinion letter in March 2000. The Camferdam Plaintiffs also received a second, substantially identical opinion letter from the law firm of Brown & Wood. In reliance on these representations, the Camferdam Plaintiffs included the COBRA transactions on their tax returns.

Jack Riggs' investments were managed by Deutsche Bank.[16] Riggs alleges that "Deutsche Bank solicited Jack Riggs to hire the Jenkens Defendants" to procure advice relating to the tax strategies.[17] Riggs carried out the tax strategy. Riggs retained Ernst & Young, who he alleges were secretly working together with Deutsche Bank and Jenkens to develop and promote the tax strategies, to prepare his 1999 tax returns, reflecting the tax strategy.[18]

## D. The Settlement Negotiations

Class Counsel and Jenkens began settlement discussions in November 2003. Jenkens' insurance carriers claimed that their policies did not cover the damages alleged by plaintiffs. Jenkens asserted that it was severely stressed by the pressure of the tax shelter litigation; the firm was having difficulty retaining lawyers and staff, and was in danger of filing for bankruptcy protection. Following an investigation of the insurance carriers' claims, "and the perilous circumstances of [Jenkens], Class Counsel believed it was in the best interest of all Class Members to immediately attempt to negotiate a global settlement." [19]

The parties, including the Camferdam and Riggs Plaintiffs, along with Jenkens' insurance carriers, participated in three mediation sessions, on December 17–18, 2003, January 16–17, 2004, and February 19, 2004. Retired Federal Judge Robert Parker presided over these mediations, which he has described as "difficult" and "intense." [20] These negotiations resulted in a Mediated Settlement Agreement, dated March 4, 2004, and a Stipulation of Settlement, dated April 28, 2004, signed by all parties, including Jenkens' insurance carriers. The settlement agreement provided for a settlement fund of $75 million, consisting of $63.5 million from the insurance carriers, $5.25 million from Jenkens, and a total of $6.25 million from the individual defendants.[21] The agreement also provided for extensive informal discovery from Jenkens.

---

12. *See Camferdam* First Amended Complaint ¶ 46.

13. *See id.* ¶ 47.

14. *See id.* ¶¶ 51–63.

15. *See id.* ¶¶ 64–74.

16. *See Riggs* Fourth Amended Petition ¶ 30.

17. *See id.* ¶ 24.

18. *See id.* ¶¶ 25, 26, 30.

19. Declaration of Lead Counsel in Support of Certification and Approval of the Settlement ("Lead Counsel Decl.") ¶ 48.

20. Declaration of Retired Judge Robert M. Parker, Mediator ("Parker Decl.") ¶ 6.

21. The settlement contains no explicit plan of allocation. The Stipulation of Settlement provides that the court-appointed Special Masters will recommend a plan of allocation for the Court's approval, taking into account various factors relating to the extent of each class member's injuries.

The Court preliminarily approved this settlement on May 14, 2004, and notice was sent to the class. Class members were given until September 27, 2004 to opt out of the class. One hundred and twenty-two plaintiffs timely elected to opt out.[22] This put the settlement at risk. The settlement contemplated the release of Jenkens' insurers in return for their contribution to the settlement fund; it thus left Jenkens without insurance to defend the claims of opt outs. Jenkens had earlier stated that it was unable and unwilling to settle in the face of significant numbers of opt outs. Because of the opt out problem, the parties held a fourth round of mediation on December 1–2, 2004, presided over by retired Judge Parker and by Michael Young of Judicial Arbitration and Mediation Services, who had been appointed Special Master by the Court.

### E. The Amended Settlement

This fourth round of mediation resulted in an Amended Mediated Settlement Agreement, dated December 2004. The amended settlement provides for an increased settlement fund of $81,557,805, consisting of $70,057,805 from the insurance carriers, $5.25 million from Jenkens, and a total of $6.25 million from the individual defendants. The insurers have further agreed to make $24,942,195—the remainder of the "unreinstated" insurance coverage under Jenkens' policy—available to Jenkens to defend or resolve the claims of opt-outs. In addition, a further $25 million in "reinstated" coverage may be available.[23]

### F. The Bar Order and Judgment Credit

As part of the settlement, the parties' proposed judgment contains a Bar Order and Judgment Credit provision. Because this provision is the focus of most of the objections,[24] it warrants further description.

The Bar Order provides that all non-settling defendants and all third parties are barred and enjoined from commencing or prosecuting any action against Jenkens on a "Claim Over."[25] A Claim Over is defined as any claim that

(i) directly or indirectly arises out of or is based upon, related to or connected with any of the Tax Strategies, and (ii) is for recovery of amounts that the Non–Settling Defendant or Third Party paid or owes to the Class (if the case in which an issue arises is a class action) or a Class Member (if the case in which an issue arises is brought by a Class Member). "Claims Over" includes, but is not limited to, all claims by a Non–Settling Defendant or Third Party for contribution and indemnity for amounts owed or paid to a Class Member. It does not, however, include claims based on a written indemnity agreement. . . .[26]

Essentially, the Bar Order prohibits any non-settling defendant or third party from seeking contribution or indemnification from Jenkens. The Bar Order is mutual: it also prohibits Jenkens from seeking contribution or indemnification from non-settling defendants or third parties.[27] Non-settling defendants and third parties are not precluded from seeking contribution from Jenkens for damages they might eventually be required to pay to plaintiffs who have opted out of the class.[28] The Bar Order applies only to claims for contribution (however denominated); it does not bar any independent claims non-settling defendants and third parties may have against Jenkens.

To compensate non-settling defendants and third parties for the loss of their contribution claims, the proposed judgment also contains a Judgment Credit provision. Pursuant to this provision, the Court is asked to

---

22. Thirty-three of these plaintiffs subsequently returned to the Class.

23. Jenkens' primary carrier asserts that the claims in this case do not trigger reinstatement of the additional coverage. Pursuant to the amended settlement, Jenkens has agreed to release the excess carriers from any reinstatement claim, in return for the excess carriers' waiver of coverage defenses and policy defenses on the $75 million of unreinstated insurance coverage.

24. *See infra* Part II.G.

25. Proposed Judgment (submitted in final form on January 27, 2005) ¶ 12.

26. *Id.* ¶ 1(b).

27. *See id.* ¶ 12.

28. *See id.*

order that any judgment or award obtained by a class member against a non-settling defendant or third party will be reduced "by the amount or percentage, if any, necessary under applicable law to relieve the Released Persons [the Jenkens defendants] of all liability to such Non–Settling Defendant or Third Party on such barred Claims." [29] This reduction is to be "accomplished by judgment reduction, partial or complete release, settlement credit, setoff, election to recover exclusively under an award for which there is no Claim Over, or such other method as may be permitted by applicable law." [30] The proposed judgment further states that "Such judgment credit, settlement credit, release or setoff shall be in an amount or percentage sufficient under applicable law as determined by the court in which the issue arises to compensate the Non–Settling Defendant or Third Party for the loss of its Claim Over." [31]

The Judgment Credit provision does not specify a single method of calculating the credit. Instead, it leaves the calculation of the credit to the "applicable law" of the jurisdiction in which a class member may win a judgment or award against a non-settling defendant or third party. The credit will be whatever is necessary under the applicable law to compensate the non-settling defendant or third party for the loss of its claim for contribution.[32]

### G. Objections and the Fairness Hearing

On December 29, 2004, the settling parties disseminated a supplemental notice of the amended settlement to the class, and the Court extended the deadline for objections to January 10, 2005, to accommodate objections to the amended settlement. The Court received objections from three groups of plaintiffs: the "Harslem" plaintiffs, the "Mattei" plaintiffs, and the "Moore" plaintiffs.[33] The Court also received objections from two non-settling defendants, BDO and Deutsche Bank, and from the Government. A fairness hearing was held on January 24, 2005. In response to objections, the settlement's proponents agreed to certain changes to the language of the proposed judgment offered for the Court's approval; I therefore ordered one final notice to the class, including the language of the proposed judgment, and a final one-week extension of the time for objections. The Court received continued objections from the Harslem Plaintiffs, the Mattei Plaintiffs, BDO, Deutsche Bank and the Government; there were no new objectors.

## III. LEGAL STANDARD

### A. Class Certification

Federal Rule of Civil Procedure 23 governs class certification. To be certified, a putative class must meet all four requirements of Rule 23(a) as well as the requirements of one of the three subsections of Rule 23(b). In this case, as in most cases seeking money damages, plaintiffs bear the burden of demonstrating that the class meets the requirements of Rule 23(a)—referred to as numerosity, commonality, typi-

---

**29.** *Id.* ¶ 13(a).

**30.** *Id.* ¶ 13(b).

**31.** *Id.* ¶ 13(c).

**32.** In the majority of states, the applicable law precludes claims for contribution against settling defendants, and provides a compensating judgment credit. *See, e.g.*, Tex. Civ. Prac. & Rem. Code § 33.015; N.Y. Gen. Oblig. Law § 15.108(b) (McKinney 2003). In those jurisdictions, the Bar Order and Judgment Credit provisions will have no effect, and the judgment credit will be determined by the applicable law—generally, either a *pro tanto* reduction, equal to the amount paid by Jenkens attributable to common damages, a *pro rata* reduction, apportioning an equal share of liability to each tortfeasor, or a proportionate fault reduction, based on a deter-

mination of Jenkens' and the third party's relative share of fault. *See In re Masters Mates & Pilots Pension Plan,* 957 F.2d 1020, 1027–1030 (2d Cir.1992) (discussing methods of calculating judgment credit). In jurisdictions in which contribution claims against settling tortfeasors are not permitted, non-settling defendants and third parties will not be entitled to any judgment credit. In jurisdictions in which contribution claims against settling tortfeasors are permitted, non-settling defendants and third parties will be entitled to a judgment credit equal to the value of the contribution claims they would have been able to assert against Jenkens, but for the Bar Order.

**33.** The Harslem Plaintiffs are Eric Harslem, Lorraine Clasquin, Douglas MacGregor, and Jeffrey and Loretta Clarke. The Mattei Plaintiffs are James E. Mattei and J. Scott Mattei. The Moore Plaintiffs are Denis Hoasjoe and Robert Moore.

cality, and adequacy [34]—and that the action is "maintainable" under Rule 23(b)(3).[35] Under Rule 23(b)(3)—the only applicable subsection of Rule 23(b)—"common" issues of law or fact must "predominate over any questions affecting only individual members," and a class action must be demonstrably "superior" to other methods of adjudication.[36]

The Supreme Court has held that when a class is certified for settlement purposes only, the "specifications of [Rule 23]—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention." [37] The Court recognized one exception to this requirement: when confronted with a settlement class, "a district court need not inquire whether the case, if tried, would present intractable management problems." [38]

The Second Circuit requires a "liberal" construction of Rule 23.[39] Thus, "to deny a class action simply because all of the allegations of the class do not fit together like pieces in a jigsaw puzzle [ ] would destroy much of the utility of Rule 23." [40] Notwithstanding the general liberality in this circuit towards class certification motions, the Supreme Court unequivocally requires district courts to undertake a "rigorous analysis" that the requirements of Rule 23 have been satisfied.[41]

In ruling on class certification, a district court may not simply accept the allegations of plaintiffs' complaint as true.[42] Rather, it must determine, after a "rigorous analysis," whether the proposed class comports with all of the elements of Rule 23. "[S]ometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question.... [A]ctual, not presumed, conformance with Rule 23(a) remains ... indispensable." [43]

"In order to pass muster, plaintiffs—who have the burden of proof at class certification—must make 'some showing'" that the proposed class comports with Rule 23.[44] That showing may take the form of, for example, expert opinions, evidence (by document, affidavit, live testimony, or otherwise), or the uncontested allegations of the complaint. However, "a district court is forbidden to weigh the evidence on class certification [and] plaintiffs need not establish the elements of Rule 23 by a preponderance of the evidence." [45]

### 1. The Requirements of Rule 23(a)
#### a. Numerosity

■ Rule 23 requires that the class be "so numerous that joinder of all members is impracticable." [46] "Impracticability does not mean impossibility of joinder, but refers to the difficulty or inconvenience of joinder." [47] Although precise calculation of the number of

**34.** *See Caridad v. Metro–North Commuter R.R.,* 191 F.3d 283, 291 (2d Cir.1999).

**35.** *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

**36.** Fed.R.Civ.P. 23(b)(3).

**37.** *Amchem Prods.,* 521 U.S. at 620, 117 S.Ct. 2231.

**38.** *Id.*

**39.** *See Korn v. Franchard Corp.,* 456 F.2d 1206 (2d Cir.1972); *In re Lloyd's Am. Trust Fund Litig.,* No. 96 Civ. 1262, 1998 WL 50211, at *5 (S.D.N.Y. Feb. 6, 1998) ("The Second Circuit has directed district courts to apply Rule 23 according to a liberal rather than a restrictive interpretation.").

**40.** *Green v. Wolf Corp.,* 406 F.2d 291, 300 (2d Cir.1968).

**41.** *General Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).

**42.** *See In re Initial Public Offering,* No. 21 MC 92, 2004 WL 2297401, at *19 (S.D.N.Y. Oct. 13, 2004).

**43.** *Falcon,* 457 U.S. at 161, 102 S.Ct. 2364.

**44.** *In re Initial Public Offering,* 2004 WL 2297401, at *19 (quoting *Caridad,* 191 F.3d at 292) (original emphasis).

**45.** *Id.* (citing *Caridad,* 191 F.3d at 293).

**46.** Fed.R.Civ.P. 23(a)(1).

**47.** *In re Independent Energy Holdings PLC Sec. Litig.,* 210 F.R.D. at 479 (citing *In re Avon Sec. Litig.,* No. 91 Civ. 2287, 1998 WL 834366, at *5 (S.D.N.Y. Nov. 30, 1998)).

class members is not required, and it is permissible for the court to rely on reasonable inferences drawn from available facts, numbers in excess of forty generally satisfy the numerosity requirement.[48]

### b. Commonality

■ Commonality requires a showing that common issues of fact or law affect all class members.[49] A single common question may be sufficient to satisfy the commonality requirement.[50] "The critical inquiry is whether the common questions are at the core of the cause of action alleged."[51]

### c. Typicality

■ The typicality requirement "is not demanding."[52] A named plaintiff's claims are "typical" pursuant to Rule 23(a)(3) where each class member's claims arise from the same course of events and each class member makes similar legal arguments to prove the defendants' liability.[53] "The rule is satisfied ... if the claims of the named plaintiffs arise from the same practice or course of conduct that gives rise to the claims of the proposed class members."[54] Accordingly, the commonality and typicality requirements " 'tend to merge' because '[b]oth serve as guideposts for determining whether ... the named plaintiff's claim and the class claims are so inter-related that the interests of the class members will be fairly and adequately protected in their absence.' "[55]

### d. Adequacy

■ Plaintiffs must also show that "the representative parties will fairly and adequately protect the interests of the class."[56] To do so, plaintiffs must demonstrate that the proposed class representatives have no "interests [that] are antagonistic to the interest of other members of the class."[57] Class representatives must have "an interest in fairly and vigorously pursuing" the claims of the class, so that there is an "assurance of vigorous prosecution."[58] In addition, "Rule 23(a)(4) requires that plaintiffs demonstrate that class counsel is qualified, experienced, and generally able to conduct the litigation."[59]

Class representatives cannot satisfy Rule 23(a)(4)'s adequacy requirement if they "have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interest of the attorneys."[60] However, it is well established that "in complex litigations ... a plaintiff need not have expert knowledge of all aspects of the case to qualify as a class representative, and a great deal of reliance upon the expertise of counsel is to be expected."[61]

---

**48.** *See Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 198 (S.D.N.Y.1992).

**49.** *See* Fed.R.Civ.P. 23(a)(2); *see also Trief*, 144 F.R.D. at 198.

**50.** *See German v. Federal Home Loan Mortgage Corp.*, 885 F.Supp. 537, 553 (S.D.N.Y.1995).

**51.** *Labbate–D'Alauro v. GC Servs. Ltd. P'shp.*, 168 F.R.D. 451, 456 (E.D.N.Y.1996) (quotation omitted). *Accord In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145, 166–67 (2d Cir.1987).

**52.** *Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1106 (5th Cir.1993) (citing *Shipes v. Trinity Indus.*, 987 F.2d 311, 316 (5th Cir.1993)).

**53.** *See Robinson v. Metro–North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir.2001).

**54.** *Marisol A. v. Giuliani*, 929 F.Supp. 662, 691 (S.D.N.Y.1996), *aff'd*, 126 F.3d 372 (2d Cir. 1997).

**55.** *Caridad*, 191 F.3d at 291 (alterations in original) (quoting *Falcon*, 457 U.S. at 157 n. 13, 102 S.Ct. 2364).

**56.** Fed.R.Civ.P. 23(a)(4). *See also Banyai v. Mazur*, 205 F.R.D. 160, 164 (S.D.N.Y.2002).

**57.** *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir.2000). An antagonistic interest arises when there is a "fundamental conflict or inconsistency between the claims of the proposed class members" that is "so palpable as to outweigh the substantial interest of every class member in proceeding with the litigation." *In re NASDAQ Market–Makers Antitrust Litig.*, 169 F.R.D. 493, 514–15 (S.D.N.Y.1996).

**58.** *Robinson*, 267 F.3d at 170.

**59.** *Marisol A.*, 126 F.3d at 378.

**60.** *Baffa*, 222 F.3d at 61 (quotations and citation omitted).

**61.** *In re AM Int'l Inc., Sec. Litig.*, 108 F.R.D. 190, 196–97 (S.D.N.Y.1985).

## 2. Rule 23(b)

If plaintiffs can demonstrate that the proposed class satisfies the elements of Rule 23(a), they must then establish that the action is "maintainable" as defined by Rule 23(b). Rule 23(b) provides that "an action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition" one of three alternative definitions of maintainability is met. The proponents of this settlement argue that the action is maintainable under subsection (b)(3), which requires "that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." [62] Rule 23(b)(3) thus has two elements: "predominance" and "superiority."

■ "Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." [63] "The 23(b)(3) predominance requirement is 'more stringent' and 'far more demanding than' the commonality requirement of Rule 23(a)." [64] Courts have frequently found that the requirement was not met where, notwithstanding the presence of common legal and factual issues that satisfy the commonality requirement, individualized inquiries predominate. [65] Nonetheless, the Supreme Court has noted that "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud...." [66]

■ The superiority prong of Rule 23(b)(3) requires a court to consider whether a class action is superior to other methods of adjudication. [67] In making the requisite inquiries into predominance and superiority, courts should consider, *inter alia,*

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action. [68]

Where a class is being certified solely for settlement purposes, a court need not consider the last of these factors, the manageability issues that would arise if the case were to be litigated as a class action, "for the proposal is that there be no trial." [69]

## B. The Fairness of the Proposed Settlement

There is a "strong judicial policy in favor of settlements, particularly in the class action context." [70] "The compromise of complex litigation is encouraged by the courts and favored by public policy." [71] However, the

---

**62.** Fed.R.Civ.P. 23(b)(3).

**63.** *Moore v. PaineWebber, Inc.,* 306 F.3d 1247, 1252 (2d Cir.2002).

**64.** *Maneely v. City of Newburgh,* 208 F.R.D. 69, 76 (S.D.N.Y.2002) (quoting *Amchem Prods.,* 521 U.S. at 623–24, 117 S.Ct. 2231).

**65.** *See, e.g., In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.,* 209 F.R.D. 323, 353 (S.D.N.Y.2002) (finding individual issues predominate although defendants conceded commonality); *Augustin v. Jablonsky,* No. 99–CV–3126, 2001 WL 770839, at *13 (E.D.N.Y. Mar. 8, 2001) (finding individualized issues of proximate causation predominate despite plaintiffs' showing of commonality under Rule 23(a)(2)); *Martin v. Shell Oil Co.,* 198 F.R.D. 580, 592–93 (D.Conn. 2000) (finding individualized proof of breach, causation, and trespass predominates where commonality was not contested).

**66.** *Amchem Prods.,* 521 U.S. at 625, 117 S.Ct. 2231.

**67.** *See* Fed.R.Civ.P. 23(b)(3). *See also Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 164, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

**68.** Fed.R.Civ.P. 23(b)(3).

**69.** *Amchem Prods.,* 521 U.S. at 620, 117 S.Ct. 2231.

**70.** *In re PaineWebber Ltd. P'ships Litig.,* 147 F.3d 132, 138 (2d Cir.1998).

**71.** 4 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 11:41, at 87 (4th ed.2002).

Court "must eschew any rubber stamp approval in favor of an independent evaluation" of the settlement.[72] In carrying out this evaluation, "[t]he Court has a fiduciary duty to the non-representative class members who were not party to the settlement agreement 'because inherent in any class action is the potential for conflicting interests among the class representatives, class counsel, and absent class members.' "[73]

"A court may approve a class action settlement if it is 'fair, adequate, and reasonable, and not a product of collusion.' A court determines a settlement's fairness by looking at both the settlement's terms and the negotiating process leading to settlement."[74] "A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery."[75]

■ In addition to looking at the negotiating process, courts consider the following factors in the approval of class action settlements:

(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reason-

ableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.[76]

When a settlement is negotiated before class certification, the danger of collusion between defendants and class counsel is heightened. Moreover, a settlement agreement "generates [ ] momentum" and may look, to class members and even to the court, "like a *fait accompli.*"[77] Therefore, "a proposed settlement negotiated before class certification is subjected to a higher degree of scrutiny than a later settlement."[78]

## C. Permitting a Second Opt–Out Opportunity Under Rule 23(e)(3)

Federal Rule of Civil Procedure 23(e)(3) provides that "[i]n an action previously certified as a class action under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so."[79] The Advisory Committee Note states that:

[t]he decision whether to approve a settlement that does not allow a new opportunity to elect exclusion is confided to the court's discretion. The court may make this decision before directing notice to the class under Rule 23(e)(1)(B) or after the Rule 23(e)(1)(C) hearing. Many factors may influence the court's decision. Among these are changes in the information available to class members since expiration of the first opportunity to request exclusion, and the nature of the individual class members' claims.[80]

72. *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir.1974), *abrogated on other grounds by Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir.2000). The Court should, however, "stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." *Id.*

73. *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 454–55 (S.D.N.Y.2004) (quoting *Martens v. Smith Barney, Inc.*, 181 F.R.D. 243, 262 (S.D.N.Y.1998)).

74. *Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116–17 (2d Cir.2005) (quoting *Joel A. v. Giuliani*, 218 F.3d 132 (2d Cir.2000)).

75. *Id.* (citing Manual for Complex Litigation, Third, § 30.42 (1995)). *Accord Thompson v. Metro. Life Ins. Co.*, 216 F.R.D. 55, 61 (S.D.N.Y.

2003) ("A strong presumption of fairness attaches to proposed settlements that have been negotiated at arm's length.").

76. *Grinnell Corp.*, 495 F.2d at 463.

77. *Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co.*, 834 F.2d 677 (7th Cir.1987).

78. 5–23 Moore's Federal Practice—Civil § 23.161 (3d ed.2004). *Accord County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1323 (2d Cir.1990).

79. Fed.R.Civ.P. 23(e)(3).

80. Fed.R.Civ.P. 23(e)(3) Advisory Committee Note.

## IV. DISCUSSION

### A. Class Certification

The threshold issue, before undertaking any consideration of the fairness of the settlement, is whether the class may be certified under Rule 23. For the following reasons, I find that certification is appropriate.

#### 1. Rule 23(a)

##### a. Numerosity

Over the period in question—January 1, 1999 through December 31, 2003—Jenkens issued advice concerning the tax strategies to over 1,100 clients. This number is more than sufficient to render joinder of all class members impracticable. No objector contests numerosity.

##### b. Commonality

■ The common questions in this case are overwhelming. All members of the class received legal advice from Jenkens concerning the tax strategies. If this case were to proceed to trial, all class members' claims would involve the same common questions of liability, including: (1) was the tax advice correct? (2) If not, was it negligent, or knowingly false? (3) Did the advice fail to disclose material facts about the transactions, or the controlling law? (4) Did Jenkens falsely represent that its advice and opinion letters were "independent"? (5) Was reliance on the Jenkens advice and opinion letters reasonable, given that each letter asserted only that the strategies were "more likely than not" to pass muster? (6) Were the fees charged unreasonable and excessive? These questions of law and fact are at the core of this action, and are more than sufficient to establish commonality.

In addition, each class member's claims involve common questions of fact as to the alleged conspiracy between Jenkens and the other defendants, and as to the extent to which Jenkens was responsible for the repre-

sentations made by their alleged co-conspirators.[81] Finally, even at the damages stage, there are many common issues of law, including whether the allegedly excessive fees paid to Jenkens for their opinion letters and advice are recoverable. The requirement of commonality is thus easily met here.

##### c. Typicality

■ The Denney, Camferdam, and Riggs Plaintiffs, like all class members, received legal advice from Jenkens regarding the tax strategies, and executed those tax strategies. All proposed class representatives allege that they were injured by the same acts of Jenkens and by the same alleged conspiracy as the rest of the class.[82] The fact that some class members were approached by different Marketing Participants does not defeat typicality. "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." [83]

##### d. Adequacy

No objector challenges the adequacy of the class representatives' counsel. There can be no question that class counsel are highly experienced, qualified and able, and have been zealous in their prosecution of this case.

The Harslems challenge the adequacy of the proposed class representatives, arguing that the proposed class is divided by a conflict of interest. The Denney Plaintiffs, the Harslems argue, were introduced to COBRA by the accounting firm of Pasquale & Bowers, while the Harslems were introduced to the scheme by Ernst & Young. Pasquale & Bowers is a small, local firm, while Ernst & Young is one of the world's largest accounting and financial services firms. Therefore (the Harslems' argument runs) because

---

81. *See Buford v. H & R Block,* 168 F.R.D. 340, 349 (D.Ga.1996) ("In RICO cases, commonality is frequently satisfied. An alleged scheme to defraud which affects a class of people is a common question of law and/or fact, regardless of the characteristics of the scheme's intended victims.").

82. *See* 5–23 Moore's Federal Practice—Civil § 23.24 ("In actions under [RICO], the typicality requirement is satisfied if the claims of the class representative and the class arise from the same scheme by the defendant to defraud class members.").

83. *Robidoux v. Celani,* 987 F.2d 931, 936–37 (2d Cir.1993).

Jenkens "represent[s] the only 'fat wallet' to the Denney [Plaintiffs]," the Denney Plaintiffs are only concerned with maximizing their recovery from Jenkens.[84] The Harslems, by contrast, are mainly concerned with their recovery from Ernst & Young, "a wrong-doer with far deeper pockets" than either Jenkens or Pasquale & Bowers.[85] The Harslems object to the judgment credit provision in the proposed settlement, which is a necessary concession to secure a settlement with Jenkens, but might limit their recovery from Ernst & Young. Even without the proposed judgment credit provision, however, settlement with Jenkens would still affect the rights of class members against joint tortfeasors, because many states have statutory judgment credit rules.[86] The Harslems argue that they and the class representatives therefore have fundamentally opposed interests with respect to a settlement with Jenkens: the Harslems argue that they, and similarly situated class members, would prefer not to put their recovery from deep pocketed third parties at risk by settling with Jenkens, while the Denney Plaintiffs have nothing to lose by such a settlement.

The Harslems' argument would be compelling, were it supported by the facts; but it is not. *First,* all class representatives (and almost all class members, including the Harslems) have claims against Deutsche Bank, another deep pocket who acted (in most cases) as the counter-party to the tax shelter transactions and is alleged to have been a part of the conspiracy. *Second,* the Denney Plaintiffs were introduced to COBRA not only by Pasquale & Bowers, but also by the undeniably deep-pocketed BDO.[87] The Camferdam Plaintiffs, joined in this action as class representatives, were introduced to the scheme by Ernst & Young, and are in essentially the same position as the Harslems.[88] Jack Riggs was introduced to the scheme by Deutsche Bank, and used Ernst & Young to prepare his tax returns.[89] Thus, all of the class representatives have claims against deep-pocketed third parties, similar to those of the Harslem Plaintiffs, which will be affected equally by the settlement with Jenkens. The interests of the class and its representatives are therefore aligned: in agreeing to the judgment credit provision, each class member and their representatives are making an equal concession, in return for an equal share of the benefits of the settlement.

■ The Matteis raise a different potential conflict. They assert that there is an irreconcilable conflict between class representatives and some class members because the former have been injured as a result of penalties assessed by the tax authorities, while the latter have not yet suffered any injury although penalties may be assessed against them in the future. The Matteis argue that this "is reminiscent of the conflict that plagued the proposed settlement class in *Amchem.*"[90] For the following reasons, this argument is unavailing.

---

**84.** Harslem Plaintiffs' Memorandum of Law in Support of Motion to Opt Out or in the Alternative to Object to the Settlement ("Harslem Mem.") at 4.

**85.** *Id.* at 4.

**86.** *See, e.g.,* N.Y. Gen. Oblig. Law § 15–108(b).

**87.** The Harslems assert that "at least two" of the Denney Plaintiffs have stated that they have no complaint against BDO. Harslem Mem. at 3 n. 8 (citing November 1, 2003 Affidavit of Thomas Denney in Opposition to BDO's Motion to Compel Arbitration and October 30, 2003 Affidavit of Kyle Blumin in Opposition to BDO's Motion to Compel Arbitration). The Harslems appear to have misconstrued Denney and Blumin's affidavits. In those affidavits, Denney and Blumin stated only that their complaints against BDO were not based on BDO's performance of *the services described in their consulting agreements* (and were therefore not subject to the arbitration clauses in those agreements); they certainly did not abandon their claims against BDO.

**88.** *See Camferdam* First Amended Complaint, ¶¶ 10–12. The Harslems argue that their claims against Ernst & Young are stronger than those of the Camferdams. This is not persuasive. The fact that their complaint uses slightly stronger language than the Camferdams' complaint to describe essentially the same conduct and representations (*i.e.,* alleging that Ernst & Young promised that the chance of being audited was "next to nothing") does not demonstrate that their claim against Ernst & Young will fare significantly better in litigation than the Camferdams' claim.

**89.** *Riggs* Fourth Amended Petition ¶¶ 24–26.

**90.** Mattei Plaintiffs' Supplemental Memorandum of Law Opposing Class Certification and Settlement at 7.

In *Amchem,* the Supreme Court addressed a challenge to approval of a settlement class in a large consolidated asbestos litigation. The "sprawling" and "amorphous" class [91] included both injured plaintiffs and plaintiffs who had been exposed to asbestos but who had not yet manifested any injury. The Court held that the class representatives could not adequately represent both groups of plaintiffs.

> In significant respects, the interests of those within the single class are not aligned. Most saliently, for the currently injured, the critical goal is generous immediate payments. That goal tugs against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future.[92]

There were several problems with the proposed settlement class in *Amchem. First,* the exposure-only plaintiffs might never suffer an injury or might manifest an injury decades after the settlement. *Second,* if they did eventually suffer an injury, the magnitude of that injury was impossible to assess at the time of the settlement. As noted by the Third Circuit, those who were not yet injured faced "vastly different outcomes." [93] *Finally,* because of the size of the class and the uncertainty as to whether some potential claimants would ever be damaged, it was difficult or impossible to ascertain class members and provide adequate notice to all putative class members, many of whom may not have been aware that they were exposed to asbestos.

None of these problems plague the class now before this Court. *First,* members of this class have been identified as all those who received tax advice from the Jenkens defendants, and implemented the tax strategies in whole or in part, during a fixed time frame, between January 1, 1999 and December 31, 2003. Each of those 1,076 class members has received notice of the settlement.[94] Thus all class members are known to the settling parties and have been identified. *Second,* all class members have suffered a cognizable injury because they paid (allegedly) excessive fees for (allegedly) negligent or fraudulent tax advice.[95] While it is true that some class members do not yet know the full extent of their injury, because they may yet be assessed penalties by the IRS, the cut-off for such assessments is rapidly approaching. The IRS must assess a tax deficiency within three years after the return is filed.[96] Thus, all injuries can be determined within a finite period of time. Because all groups of plaintiffs, both the audited and the unaudited, have already manifested some injury, and because even the unaudited will be audited soon, if they are audited at all, they share a common interest in obtaining some recovery at this time.[97]

It is always possible to identify potential class conflicts. For example, some plaintiffs have a greater or lesser tolerance for facing the risks of trial versus settlement. The Second Circuit has noted that "not every potential disagreement between a representative and class members will stand in the way of a class suit." [98] Rather, "the conflict

---

**91.** *Amchem Prods.,* 521 U.S. at 627–28, 117 S.Ct. 2231.

**92.** *Id.* at 626, 117 S.Ct. 2231.

**93.** *Georgine v. Amchem Prods.,* 83 F.3d 610, 633 (3d Cir.1996). (finding that plaintiffs might suffer from asbestosis, lung cancer, mesothelioma or a number of other conditions).

**94.** The figure of 1,076 does not include persons who are class members because they filed joint returns with those to whom Jenkens rendered opinions, or the 121 class members who received advice from Jenkens and implemented the strategies in part, but received no opinion letters. *See* Jenkens Mem. at 6 n. 4.

**95.** Among the proposed factors to be considered in allocating the settlement is "the amount of

fees paid to Jenkens & Gilchrist by the Class Member." Stipulation of Settlement at 40.

**96.** *See* 26 U.S.C. § 6501(a). Jenkens estimates that approximately 60% of class members engaged in the tax strategies in 1998 or 1999, and are therefore protected by the statute of limitations if they have not already been audited.

**97.** Moreover, it is possible to predict the extent of an unaudited class member's potential exposure for back taxes and penalties. In allocating the fund, the Special Masters and the Court will of course take care to ensure that sufficient funds are reserved for those who have not yet been audited.

**98.** *Wal–Mart Stores, Inc. v. Visa USA Inc.,* 280 F.3d 124, 145 (2d Cir.2001) (quoting 1 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 3.26, at 3–143 (3d ed.1992)).

that will prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite must be fundamental." [99] There are no such fundamental conflicts here.[100]

### 2. Rule 23(b)(3)

#### a. Predominance

■ The Harslems argue that common issues do not predominate over individual ones. *First*, the Harslems observe that different class members were introduced to the scheme by different Marketing Participants, and argue that the resulting factual differences among class members' claims defeat predominance. *Second*, they argue that the claims asserted "are ill-suited for class treatment because the strength of the claims depends on very individual factual inquiries," in particular with reference to reliance.[101] *Third*, they point to differences in levels of sophistication among class members. *Finally*, they argue that the fact that many different states' laws could apply to these claims prevents a finding of predominance. None of these arguments is persuasive.

Despite the factual differences pointed to by the Harslems, "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole . . . predominate over those issues that are subject only to individualized proof." [102] The core issues in class members' claims against Jenkens relate to Jenkens' representations to the class members, in particular the opinion letters. Jenkens' opinion letters were substantially identical. The legal advice given by Jenkens regarding the tax strategies was always the same. Thus, generalized proof—the opinion letters, and other evidence of Jenkens' legal advice—could be used to establish liability. Although different plaintiffs dealt with different accounting firms, it is *Jenkens'* conduct toward plaintiffs that would be relevant to the determination of liability, and that conduct was essentially the same with respect to all class members. Jenkens' liability toward all class members turns on the same questions of law and fact identified above—most significantly, whether the advice was negligently given, or knowingly false.

The fact that class members relied not only on Jenkens' representations to them, but also on the representations of several different accounting firms, does not defeat predominance. In *Moore v. PaineWebber, Inc.*, the Second Circuit held that class certification for fraud-based claims could be proper where the misrepresentations made to each member of the class were materially uniform, and reliance could thus be "established by generalized proof." [103] The *Moore* court further held that even oral misrepresentations, made by different sales agents, could be considered materially uniform, even in the absence of proof that the misrepresentations followed a specific script.[104]

Here, as noted, Jenkens' most important representations—in the form of their opinion letters—were both written and materially uniform. It is these representations that are at the core of the case, and would predominate in plaintiffs' attempts to prove liability. Insofar as the case turns on oral representa-

---

**99.** *Id. Accord Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) ("the existence of minor conflicts alone will not defeat a party's claim to class certification: the conflict must be a fundamental one going to the specific issues in controversy.").

**100.** I note that all potential class members received notice of this settlement months ago. Yet this potential problem was raised by a single objector less than a week ago. While this in itself does not defeat the objection, it strongly suggests that the argument lacks merit.

**101.** Harslem Mem. at 17.

**102.** *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir.2001) (quotation marks and citation omitted).

**103.** 306 F.3d 1247, 1253 (2d Cir.2002). However, mere "proof of a central, coordinated scheme" among defendants is not sufficient to establish predominance, if the representations are not materially uniform. *Id.*

**104.** *Id.* at 1255 ("While training and the existence of scripts are relevant factors, the inquiry should remain focused on whether material variations in the misrepresentations existed. . . . Thus, the fact that sales agents submitted affidavits that they did not participate in training programs or follow scripts, even if uncontroverted, is insufficient to demonstrate by itself that the misrepresentations themselves were not materially uniform.").

tions, it appears that those representations were also materially uniform. Although the form of the representations may have varied, the basic pitch was always the same: that the tax shelters were legitimate and supported by independent legal advice, and that plaintiffs would not face penalties. The only difference the Harslems point to is that they were (allegedly) informed that "their chances of being audited were next to nothing" while other plaintiffs were informed that they might be audited, but that the shelter was legitimate and that the opinion letter would protect them from penalties.[105] Despite these (alleged) differences in emphasis, the basic message is the same in both cases.[106] Thus, "[a]ll plaintiffs [would] rely on the same or substantially similar documents, statements, and legal theories to prove the defendants' liability."[107]

With respect to plaintiffs' RICO and conspiracy claims, the predominant issue is the existence of a conspiracy between Jenkens and the other defendants. Moreover, many of plaintiffs' allegations of fraud turn on the alleged conspiracy, insofar as plaintiffs allege that Jenkens purported to be providing "independent" analysis of COBRA when it was in fact deeply involved in COBRA's marketing and design. The existence and nature of this alleged conspiracy is therefore an issue that is common to each plaintiff, and predominates over the differences among different groups of plaintiffs who were introduced to the alleged conspiracy by different accounting firms.[108]

Common issues also predominate with respect to plaintiffs' claims that Jenkens' fees were excessive and unreasonable. The burden of this claim is that Jenkens charged high fees for advice and opinion letters which were "canned' and 'prefabricated' [and] used with hundreds, if not thousands, of other clients and ... the Jenkens Defendants charged these clients the same or similar fees for the same services and expended little, if any additional time or effort in providing the opinion letters and advice."[109] In proving this claim, each plaintiff would necessarily rely primarily on the same proof of Jenkens' course of conduct; each plaintiff would have to prove that Jenkens provided essentially identical advice and opinion letters to other plaintiffs, and the marginal cost of providing the advice was therefore very low.

The Harslems also argue that predominance fails because class members had vary-

---

**105.** Harslem Mem. at 20. By contrast, the *Moore* court pointed to far more substantial differences among the representations made to plaintiffs: *e.g.*, "[o]ne customer complaint states that the broker misrepresented the Provider as a retirement program with insurance benefits; another states that the broker represented that the Provider was an IRA; a third specifically states that the broker never mentioned that the Provider was a life insurance product." *Moore,* 306 F.3d at 1256.

**106.** *See Klay v. Humana,* 382 F.3d 1241 (11th Cir.2004), *cert. denied,* —— U.S. ——, 125 S.Ct. 877, 160 L.Ed.2d 825 (2005). In *Klay,* the Eleventh Circuit affirmed the certification of a class of physicians suing certain HMOs for fraud-based RICO claims. The court rejected the defendants' argument that individual issues of reliance predominated. The court found that while the defendants engaged in a variety of specific communications with physicians, they all conveyed essentially the same message—that the defendants would honestly pay physicians the amounts to which they were entitled. Thus, "common evidence (that is, [ ] legitimate inferences based on the nature of the alleged misrepresentations at issue)" would predominate in proving reliance, and certification was proper. *Id.* at 1259.

**107.** *In re Interpublic Secs. Litig.,* No. 02 Civ. 6527, 2003 WL 22509414, at *4 (S.D.N.Y. Nov. 6, 2003).

**108.** *See Klay,* 382 F.3d at 1255–57 (approving certification of fraud-based RICO class, and holding that "the existence of a conspiracy, and whether the defendants aided and abetted each other, were also issues common to each of the plaintiffs that tended to predominate ... the numerous factual issues relating to the conspiracy are common to all plaintiffs ... and would necessarily have to be reproven by every plaintiff if each [plaintiff's] claim were tried separately."). *See also Carnegie v. Household Int'l, Inc.,* 376 F.3d 656 (7th Cir.2004) (holding that, because "the question whether RICO was violated was separate from the question whether the targets of the violation had been injured," the prospect of separate proceedings "to determine the entitlements of the individual class members to relief ... need not defeat class treatment of the question whether the defendants violated RICO. Once that question is answered, if it is answered in favor of the class, a global settlement ... will be a natural and appropriate sequel.").

**109.** *Denney* Second Amended Complaint ¶ 376.

ing levels of sophistication regarding tax law. In any fraud-based class action, there will be differing levels of sophistication among plaintiffs; nevertheless, the Supreme Court has clearly stated that "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud." [110] This argument arises frequently in the context of securities fraud; in that context, courts have consistently held that differences in levels of sophistication are not sufficient to defeat predominance. [111] It is important to note that, regardless of differing levels of sophistication, each plaintiff in this case could prove reliance by the same common evidence. Although some plaintiffs may have known more about tax matters than others, all plaintiffs relied on the advice of their accountants and lawyers on tax matters of great complexity; even a sophisticated plaintiff could be found to have reasonably relied on such advice.

Finally, the Harslems argue that "when the law of a claim varies by state, and when putative class members are dispersed across 41 states ... predominance must fail as a matter of law." [112] This argument is unavailing. Because this is a settlement-only class, the Court need not be concerned with the feasibility of managing the trial of a class action involving many different states' laws. [113] While "there may be situations where variations in state laws are so significant so as to defeat commonality and predo-

minance even in a settlement class certification," [114] that is not the case here.

*First*, I note that many of the key issues here are matters of federal law; for example, plaintiffs' RICO claims. *Second*, many of plaintiffs' most significant state law causes of action may be governed by a single state's law, that of Illinois. In determining which state's law to apply, a federal court looks to the choice of law rules of the state in which it sits. [115] Under New York's choice of law rules, a court gives controlling effect to the law of the jurisdiction with the most significant interest in the specific issues involved in the dispute. [116] A state has a paramount interest in regulating the conduct of attorneys licensed to practice within its borders. [117] Plaintiffs' claims for malpractice (and related claims, such as negligent misrepresentation, and disgorgement of excessive fees) would therefore likely be governed by the law of Illinois.

Even insofar as plaintiffs' claims would require the application of varying state laws, the variations are not so great as to defeat predominance. "When a class action raises common issues of conduct that would establish liability under a number of states' laws, it is possible for those common issues to predominate and for class certification to be an appropriate mechanism for handling the dispute." [118] Plaintiffs' state law claims turn

---

**110.** *Amchem Prods.*, 521 U.S. at 625, 117 S.Ct. 2231.

**111.** *See, e.g., Kennedy v. Tallant*, 710 F.2d 711, 717 (11th Cir.1983) ("The degree of investment experience or sophistication of each of the class members is irrelevant."); *In re Initial Public Offering*, 2004 WL 2297401, at *32 (differences among class members in "access to sophisticated investment advice" are not sufficient to defeat certification); *In re Data Access Sys. Sec. Litig.*, 103 F.R.D. 130, 139 (D.N.J.1984) ("There will always be some individuals who read the financial statements directly, others who read secondary analyses ... and many others who relied on advice of stockbrokers or friends. If defendants' argument were to prevail that factual differences of this nature were sufficient to defeat class action certification, there could never be a class action of securities purchasers.").

**112.** Harslem Mem. at 22.

**113.** *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 529 (3d Cir.2004) ("when dealing with variations in state laws, the same concerns

with regards to case manageability that arise with litigation classes are not present with settlement classes, and thus those variations are irrelevant to certification of a settlement class."). *See also* Manual for Complex Litigation, Fourth ("Manual") § 22.921 n. 1477 ("variations in state law that might make a class-wide trial unmanageable might not defeat certification for settlement purposes.").

**114.** *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d at 529.

**115.** *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–497, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

**116.** *See id.*, 495 F.2d at 452–53.

**117.** *See The Diversified Group, Inc. v. Daugerdas*, 139 F.Supp.2d 445, 453 (S.D.N.Y.2001).

**118.** *In re Buspirone*, 185 F.Supp.2d 363, 377 (S.D.N.Y.2002). *Accord Klay*, 382 F.3d at 1262

largely on issues of federal tax law: *e.g.*, was Jenkens' advice reasonable in light of published IRS Notices and federal tax law? The basic principles that will determine liability on class members' common law claims will not vary substantially from state to state.[119] For example, plaintiffs' breach of contract claims turn on general principles of contract interpretation, which tend to be uniform among the states.[120] Even if plaintiffs' malpractice claims are not governed by Illinois law, the elements of plaintiffs' malpractice claims are substantially uniform. An attorney is held to the standard of care of a practitioner in his or her field:[121] because Jenkens was engaged in the same practice with respect to each class member, it is likely that, regardless of the applicable state law, Jenkens would be held to a uniform standard of care—that of a practitioner in federal tax law. Thus, although there may be some variations in applicable law, particularly with respect to damages,[122] the variations are not so great as to defeat predominance.

### b. Superiority

■ Although class members' individual claims are substantial, and individual resolution of these claims would not be impossible,

it is clear that class-wide resolution would be the superior method. The pressure of a thousand individual lawsuits would, in all probability, cause Jenkens to collapse and file for bankruptcy.[123] The total value of plaintiffs' claims greatly exceeds Jenkens' available assets, the value of which would be substantially reduced in bankruptcy.[124] Jenkens' insurance, the only significant asset which plaintiffs could pursue, is a "wasting policy," which is eroded by the cost of defense. Moreover, if Jenkens were to file for bankruptcy, the firm's carriers would be "relieved of concerns of a 'bad faith' claim for failing to settle within policy limits leading to the destruction of a going concern enterprise" and would be free to assert coverage defenses.[125] The likely outcome of a thousand individual suits, then, would be that at most only the first few plaintiffs at the front of the race to the courthouse would recover anything.

### B. Approval of the Settlement
### 1. The Procedural Fairness of the Settlement

This settlement is the product of extensive, protracted, arm's length negotiations by experienced and capable counsel.[126] There is

("if a claim is based on a principle of law that is uniform among the states, class certification is a realistic possibility"); *Steinberg v. Nationwide Mut. Ins. Co.*, 224 F.R.D. 67, 77 (E.D.N.Y.2004) ("A claim or defense can implicate common issues and be litigated collectively, despite the existence of state law variations, so long as the elements of the claim or defense are substantially similar....").

**119.** Plaintiffs bear the burden of showing, through an "analysis of state law variations," that such variations do not "swamp common issues." *In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. 303, 311, No. 03 Civ. 2843, 2004 WL 2750091, at *8 (S.D.N.Y.2004) (quotations omitted). Plaintiffs have met this burden, demonstrating in detail that their state law claims are based on substantially uniform principles. *See* Class Representatives' Supplemental Brief in Support of Class Settlement and Final Certification at 1–13, Apps. 4–6.

**120.** *See Klay*, 382 F.3d at 1263 ("A breach is a breach, whether you are on the sunny shores of California or enjoying a sweet autumn breeze in New Jersey.").

**121.** *See, e.g., Cunningham v. Langston, Frazer, Sweet & Freese, P.A.*, 727 So.2d 800, 803 (Ala. 1999); *Rhodes v. Batilla*, 848 S.W.2d 833, 843 (Tex.App.—Houston [14th Dist.] 1993); *Bent v.*

*Green*, 39 Conn.Supp. 416, 466 A.2d 322, 325 (1983); *Rodriguez v. Horton*, 95 N.M. 356, 622 P.2d 261, 264 (1980).

**122.** For example, the availability of back taxes and interest as damages may vary from state to state. *See Seippel v. Jenkens & Gilchrist, P.C.*, 341 F.Supp.2d 363, 383–85 (S.D.N.Y.2004) (noting split of authority and citing cases).

**123.** *See* Declaration of Arthur Steinberg, Jenkens' Bankruptcy Expert ("Steinberg Decl."), ¶ 7(b) ("It is evident that, at this stage, the failure of the firm to now settle the class action will lead to a major exit of firm partners with the high probability of the firm being thrust into a 'wind down' mode, and ultimately bankruptcy.").

**124.** *See id.* ¶ 19 (explaining that the value of Jenkens' assets would be dramatically reduced in bankruptcy, as the defunct firm's former shareholders would lose interest in collecting unpaid fees from clients).

**125.** *See id.* ¶¶ 8–17.

**126.** *See* Parker Decl. ¶¶ 6–7 ("The parties were plainly bargaining at arm's length. While many mediations are intense, this one was especially so ... All parties, especially the Plaintiffs, were very

no indication of collusion between Lead Counsel and Jenkens; indeed, on more than one occasion, it appeared that negotiations would break down. The concerns and objections of opt outs were a significant factor in negotiations, and resulted in important improvements in the settlement as late as December, 2004. The parties reached their final settlement only after the plaintiffs had conducted months of merits and confirmatory discovery. The presence of a court-appointed special master during the December 2004 negotiations helped ensure that the proceedings were free of collusion or undue pressure.[127] For these reasons, the proposed settlement is entitled to a strong presumption of fairness.

### 2. The *Grinnell* Factors

■ Application of the *Grinnell* factors weighs in favor of acceptance of the settlement. *First,* litigation of these claims would be highly complex and expensive. Plaintiffs allege a huge and intricate conspiracy between Jenkens and a large number of global financial and legal institutions, over the course of years. The investigation of such a claim, putting aside trial costs, would be exceedingly complex and expensive. Moreover, the underlying claims involve complicated tax transactions. A central issue in the case is whether Jenkens knew or should have known that COBRA was contrary to established law and published IRS Notices. If this case were to be tried, both sides would be heavily dependent on tax law experts, further compounding the expense and complexity of the

case. The burden on the parties would be significant.

*Second,* the reaction of the class has been generally positive. Out of over one thousand class members, three groups, comprising nine class members, have objected, and a further eighty-nine plaintiffs have opted out. Even after the Court gave a third and final round of notice and objections,[128] no class member raised any complaint apart from the nine who had objected previously. This reflects a rejection rate of less than 10%. Courts have frequently found this factor to be satisfied in the face of similar or higher levels of dissent.[129] I find the low level of dissent in this case particularly striking given the fact that each class member's individual claim against Jenkens is substantial; these are not plaintiffs who would remain silent if the settlement was unfair.

The *third* factor looks to "the stage of the proceedings and the amount of discovery completed[; these] are important factors to consider in order to ensure that plaintiffs have had access to material to evaluate their case and assess the adequacy of any settlement proposal."[130] Here, the parties reached a tentative settlement agreement at an early stage in this litigation, prior to discovery.[131] However, pursuant to the parties' stipulation of settlement, Jenkens provided the class with extensive discovery. Jenkens has produced approximately 70,000 documents relating to the merits of the class claims and the financial status of Jenkens.[132] Lead counsel have conducted extensive inter-

well represented in these negotiations [and] bargained very hard."). *See also* Declaration of Michael D. Young, court-appointed Special Master, ¶ 10 ("Class counsel vigorously negotiated on behalf of the class.").

127. *See County of Suffolk,* 907 F.2d at 1323 (noting that the presence of a court-appointed mediator during pre-certification hearings helped to ensure the absence of collusion or undue pressure).

128. *See infra* Part IV.C.

129. *See, e.g., Stoetzner v. U.S. Steel Corp.,* 897 F.2d 115, 118–19 (3d Cir.1990) (noting that "out of 281 class members, only twenty-nine[] filed objections to the proposed settlement"); *Grant v. Bethlehem Steel Corp.,* 823 F.2d 20, 24 (2d Cir. 1987) (noting that "[o]nly 45 of 126 class members expressed opposition to the settlement"); *Laskey v. International Union, United Automotive,*

*Aerospace and Agricultural Implement Workers,* 638 F.2d 954, 956 (6th Cir.1981) ("Significantly, only seven [class members] out of 109 made any kind of objection"); *In re Lloyd's Am. Trust Fund Litig.,* No. 96 Civ. 1262, 2002 WL 31663577, at *23 (S.D.N.Y. Nov. 26, 2002) (noting that "[o]ut of the approximately 1,350 Class Members, only 239—or less than 18 percent—have submitted objections"); *Boyd v. Bechtel Corp.,* 485 F.Supp. 610, 624 (N.D.Cal.1979) ("the Court finds persuasive the fact that eighty-four percent of the class has filed no opposition.").

130. *In re PaineWebber Ltd. P'ships Litig.,* 171 F.R.D. 104, 126 (S.D.N.Y.1997), *aff'd,* 117 F.3d 721 (2d Cir.1997).

131. *See* Lead Counsel Decl. ¶ 39.

132. *See id.* ¶ 40.

views with Jenkens witnesses, including the individual Jenkens defendants.[133] Plaintiffs thus "have a clear view of the strengths and weaknesses of their cases" and of the adequacy of the settlement.[134]

As to the *fourth* and *fifth* factors, the risks of establishing liability and damages are significant. In assessing this factor, the Court is not required to "decide the merits of the case or resolve unsettled legal questions"[135] or to "foresee with absolute certainty the outcome of the case."[136] "[R]ather, the Court need only assess the risks of litigation against the certainty of recovery under the proposed settlement."[137] Here, Jenkens has substantial defenses to all of plaintiffs' claims. Jenkens notes, in particular, the "limited 'more likely than not' nature of the opinions," and the fact that many other law and accounting firms gave similar opinions, which it argues will make it hard to demonstrate a breach of the standard of care.[138] Jenkens also argues that the class members—millionaire tax avoiders—make unsympathetic plaintiffs, and that there is a substantial possibility that they will be found to be more than 50% at fault themselves. Even if plaintiffs were able to prove liability, many of plaintiffs' significant items of damages may not be recoverable. For example, plaintiffs may not be able to recover for back taxes or interest on back taxes.[139]

*Sixth,* there is some risk of maintaining class status throughout trial. Were this action to proceed to trial, proving reliance and damages might prove unmanageable.[140] This

is especially true in light of the fact that, unlike in many class actions, plaintiffs could bring these claims individually; thus, the superiority of class action treatment would be hard to establish if this case were to be litigated.

The *seventh* factor requires the Court to examine the ability of the defendant to withstand a higher judgment. This factor "does not require that the defendant pay the maximum it is able to pay."[141] The test takes into account the possibility that, if the case were to go to trial, the defendant would not be able to survive. "The purpose behind this consideration is to determine whether defendant could withstand a judgment significantly higher than the settlement figure, assuming the case were litigated.... If a higher judgment would excessively impact the company's shareholders or would jeopardize the company's survival, this factor weighs in favor of approving the settlement."[142]

Jenkens' contribution to the settlement is $5.25 million—"over 5% of equity shareholder profits last year."[143] Although this contribution may not seem large, given the magnitude of plaintiffs' claims, Jenkens may not be able to withstand a greater judgment. Jenkens is already in a weakened condition, facing severe retention problems.[144] Jenkens argues, persuasively, that it could not contribute more to the settlement without causing more lawyers to leave the firm, likely resulting in the firm's collapse: "[a]lready unstable, the firm cannot ask its shareholders to [contribute] more and expect them to

**133.** *See id.* ¶ 42.

**134.** *In re Warner Communications Sec. Litig.,* 618 F.Supp. 735, 745 (S.D.N.Y.1985).

**135.** *Carson v. American Brands, Inc.,* 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981).

**136.** *In re Austrian & German Bank Holocaust Litig.,* 80 F.Supp.2d 164, 177 (S.D.N.Y.2000).

**137.** *Global Crossing,* 225 F.R.D. 436, 458–59.

**138.** Jenkens Mem. at 19.

**139.** *See Seippel,* 341 F.Supp.2d at 383–85.

**140.** *See In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,* 148 F.3d 283, 321 (3d Cir.1998) (noting that, because manageability is a factor if a class proceeds to trial, but not at

settlement, there will *always* be a risk of maintaining class status at trial that favors settlement, rendering this test somewhat "toothless.").

**141.** *O'Keefe v. Mercedes–Benz USA,* 214 F.R.D. 266, 301 (E.D.Pa.2003).

**142.** *Berkley v. United States,* 59 Fed.Cl. 675, 713 (2004) (citing *In re Cendant Corp. Litig.,* 264 F.3d 201, 240 (3d Cir.2001); *In re Prudential Ins. Co. of America Sales Practices Litig.,* 148 F.3d at 321).

**143.** *See* January 21, 2005 Supplemental Declaration of Thomas H. Cantrill, Jenkens' President and Chairman of the Board, ¶ 8.

**144.** The firm had 615 lawyers in 2000, but now has only 420. *See* January 17, 2005 Declaration of Thomas H. Cantrill ¶ 5.

decline offers from competitors." [145] If the case were to go to trial, the firm would be unlikely to survive.[146] Given Jenkens' position, it does not appear that the firm could withstand a significantly greater judgment.

I am less convinced that the individual defendants' contributions are reasonable in light of their ability to withstand a greater judgment. However, the individual defendants' potential contributions are relatively minor compared to the available insurance. Moreover, the individual defendants might well succeed on their claim that they are entitled to full indemnification from Jenkens. The low contributions from individual defendants do not render the settlement unfair when weighed against all other considerations.[147]

Finally, the *eighth* and *ninth* factors—the range of reasonableness of the settlement fund in light of the best possible recovery and the range of reasonableness of the settlement fund in light of all the attendant risks of litigation—weigh in favor of the settlement. Plaintiffs' best possible recovery is limited, given the likelihood that, absent this settlement, Jenkens would fail and declare bankruptcy, and the only available assets would be insurance—an uncertain source of recovery, given the carriers' coverage defenses. Moreover, class members' claims, in the aggregate, greatly exceed the available insurance or Jenkens' assets. Absent a settlement, only the first few plaintiffs in line, at best, would recover anything. There is also a significant possibility that class members would not prevail if this case were to go to trial.

Although the settlement fund by itself represents a fair and reasonable recovery, I note that the settlement also includes significant non-monetary benefits. Pursuant to the settlement, Jenkens has agreed to provide (and has already provided) discovery on plaintiffs' claims. The value of this agreement is hard to determine, but it is not negligible.[148]

For the foregoing reasons, I find that the settlement is fair and reasonable. I will, however, discuss the specific objections made to certain provisions of the proposed judgment.

### 3. Non–Settling Defendants' Objections to the Bar Order

■ Non-settling defendants BDO, joined by Deutsche Bank, object to the bar order and judgment credit. Although "[i]n a class action settlement, the normal focus is on the fairness, reasonableness and adequacy of the settlement to the plaintiff class ... [w]here the rights of third parties are affected [ ] their interests too must be considered.... Moreover, if third parties complain to a judge that a decree will be inequitable because it will harm them unjustly, [s]he cannot just brush their complaints aside." [149]

Such bar orders are common in class action settlements. "If a non-settling defendant against whom a judgment had been entered were allowed to seek payment from a defendant who had settled, then settlement would not bring the latter much peace of mind." [150] Because federal policy strongly favors settlement, especially in complex litigation, courts may approve a bar on contribution claims between the settling defen-

**145.** Jenkens Mem. at 25.

**146.** *See* Declaration of Ward Bower, Legal Consultant, ¶¶ 4–10.

**147.** *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 86 (2d Cir.2001) (upholding approval of settlement although the defendants' ability to withstand a greater judgment weighed against approval, where other *Grinnell* factors were met).

**148.** Of course, plaintiffs could possibly obtain much of this information through ordinary discovery processes. In practice, however, plaintiffs may have more success obtaining information from a cooperative, settling defendant than from an uncooperative defendant through an adversarial discovery process. *See* Lisa Bernstein and Daniel Klerman, *An Economic Analysis of*

*Mary Carter Settlement Agreements*, 83 Geo. L.J. 2215, 2222–23 (1995) (noting the value of agreements to cooperate with discovery pursuant to settlement: absent such cooperation, "[a]dverse information is ordinarily disclosed only in response to narrowly tailored discovery requests or when a defendant or his attorney fears that not revealing the information will lead to the imposition of sanctions. A recent study of the discovery process found that attempts to conceal information are often successful.").

**149.** *Masters Mates*, 957 F.2d at 1025–26 (quotations and citations omitted).

**150.** *Id.* at 1028.

dants and the non-settling defendants, "so long as there is a provision that gives the non-settling defendants an appropriate right of set-off from any judgment imposed against them." [151] If courts were not able to limit the liability of settling defendants through bar orders, "it is likely that no settlements could be reached." [152]

Nonetheless, "[a] settlement bar should not be approved unless it is narrowly tailored and preceded by a judicial determination that the settlement has been entered into in good faith and that no one has been set apart for unfair treatment." [153] In assessing the fairness of a bar order, a court may weigh relative fault, the likelihood of a plaintiff's success at trial, and the adequacy of the resources of the most culpable party to ensure that "a settling defendant escapes neither the responsibility for his wrongdoing nor, therefore, the deterrent effect which underlies the right to contribution." [154]

The order proposed here leaves the calculation of the judgment credit to the applicable law of the various jurisdictions in which a class member may bring a claim. BDO urges the Court to impose, on all cases the class members may bring, the capped proportionate share judgment credit approved in *Gerber v. MTC Electronic Technologies.* [155] Although the *Gerber* court approved that approach, it does not require it, and a "one-size-fits-all" judgment credit is neither required nor appropriate here.

"There may [ ] be instances in which a settlement may be approved without the identification of a specific judgment reduction provision." [156] In *In re Ivan F. Boesky,* [157]

the Second Circuit approved a judgment credit that required class members to "reduce or satisfy any judgment against a non-settling defendant to the extent necessary to extinguish any claims of such non-settling defendant for indemnity or contribution from [the settling defendants], as may be determined by the Court or jury." [158] The court noted that

[t]he precise methods of judgment reduction to be employed are left to a time when, if ever, judgments against particular nonsettling defendants are obtained. Deferring these issues avoids the enormous complexities of hypothesizing findings of fact and law regarding future litigation against nonsettling defendants.... Claims by nonsettling defendants for contribution or indemnification may raise issues as to the legal basis for the particular judgment and the precise facts found. Moreover, choice-of-law questions may preclude use of a single judgment-reduction method for each nonsettling defendant. Other complexities may arise that are not evident at this time and on this record. [159]

Here, class members have already brought numerous actions, on a variety of state law and federal law theories, in jurisdictions all over the nation, against non-settling defendants and numerous other third parties. To impose a single method of judgment reduction on all claims that have been or might be brought by class members, in any court or tribunal, regardless of the applicable law, would be not be appropriate. [160] Non-settling defendants and third parties will be fully

---

**151.** *In re WorldCom Inc., ERISA Litig.,* 339 F.Supp.2d 561, 569 (S.D.N.Y.2004) (quoting *Masters Mates,* 957 F.2d at 1028).

**152.** *In re Ivan F. Boesky Sec. Litig.,* 948 F.2d 1358, 1369 (2d Cir.1991).

**153.** *Masters Mates,* 957 F.2d at 1031.

**154.** *Id.* at 1028.

**155.** 329 F.3d 297, 303 (2d Cir.2003) ("Under this rule, the credit given for the settlements will be the greater of the settlement amount for common damages (a '*pro tanto*' rule) or the 'proportionate share' of the settling defendants fault as proven at trial."). Although the court approved this formula as fair, it did "not hold that such a formula is required." *Id.*

**156.** *In re WorldCom Inc., ERISA Litig.,* 339 F.Supp.2d at 569.

**157.** 948 F.2d 1358, 1362 (2d Cir.1991).

**158.** *Id.* (quotation omitted).

**159.** *Id.* at 1363, 1369.

**160.** If class members win an award against nonsettling defendants in this court, in the present action, the judgment credit would likely be *at least* the amount of the class member's recovery under the settlement attributable to common damages, in order to comport with this circuit's "one-satisfaction" rule. *See Masters Mates,* 957 F.2d at 1031.

In order that non-settling defendants may know promptly how the judgment credit in *Den-*

compensated for the loss of their contribution claims: the order ensures that they will receive a judgment credit at least equal to the contribution claim they might otherwise assert.[161] To force the settling parties to accept a judgment credit provision that would provide BDO with a credit that is potentially *greater* than the value of the contribution claims it might otherwise have been able to assert—as BDO suggests—would give BDO a windfall, and would be an impediment to settlement.[162] Moreover, forcing courts all over the country to follow a particular method of judgment reduction, which may conflict with their own policies and procedures, would be an unwarranted interference with their proceedings.

This settlement was the result of aggressive, arm's length bargaining. Given the limits on Jenkens' ability to withstand a greater judgment, I have found the settlement to be fair. There is no indication that BDO or other non-settling defendants have been treated unfairly. I also note that while BDO argues that the bar order is too generous to class members, the Harslem Plaintiffs argue that it is too generous to non-settling defendants. Such conflicting objections suggest that the provision strikes the proper balance.

#### 4. The Harslem Plaintiffs' Objections to the Judgment Credit

The Harslem Plaintiffs also object to the judgment credit provision. *First,* the Har-

slem Plaintiffs object on the ground that the judgment credit's impact falls unequally on different groups of class members, being especially unfair to those who have claims against deep-pocketed third parties. As I explained earlier, this argument is not supported by the facts. All Lead Plaintiffs, like the Harslem Plaintiffs, have essentially identical claims against deep-pocketed third parties, and will also suffer the impact of the judgment credit provision. In accepting the judgment credit provision, all plaintiffs have made a reasonable concession, necessary to secure the benefits of settlement.

The Harslem Plaintiffs also argue, citing *National Super Spuds, Inc. v. New York Mercantile Exchange,*[163] *In re Auction Houses Antitrust Litigation,*[164] and *Wal–Mart Stores,*[165] that the judgment credit provision is an impermissible attempt to impair claims "non-class claims outside the factual predicate for the settlement."[166] This argument is unavailing.

The authority cited by the Harslem Plaintiffs stands for the proposition that courts may not approve a settlement that releases claims that are not based on the identical factual predicate as those asserted by the class; however, "class action releases may include claims not presented and even those which could not have been presented as long as the released conduct arises out of the 'identical factual predicate' as the settled conduct."[167] In *In re Auction Houses* (an un-

---

*ney* will be calculated, should this case go to trial, and be able to prepare their litigation strategy accordingly, non-settling defendants in *Denney* are invited to request the opportunity to brief the issue of the appropriate judgment credit to be applied *in this case,* under the applicable law.

**161.** BDO observes that the proposed judgment "notes the 'Settling Parties' intent to *fully* protect the Released Persons [*i.e.,* Jenkens] from all Claims Over,' no similar language describes the non-settling defendants' right to be *fully* compensated. Rather, the judgment reduction language speaks only in terms of amounts or percentages '*sufficient* ... to compensate the Non–Settling Defendant.'" February 4, 2005 Letter to the Court from BDO at 2 (original emphasis). BDO is "concerned that another court ... could interpret [this language] as prioritizing Jenkens['] interests over the interests of the non-settling defendants." *Id.* I will nonetheless approve the proposed judgment on the understanding that no such construction should be placed on this language. The purpose of the judgment credit is to

*fully* compensate non-settling defendants for the loss of their contribution claims.

**162.** The uniform method of judgment reduction suggested by BDO might also, in certain situations, *under* compensate nonsettling defendants and third parties for the loss of their contribution claims—*e.g.,* where the applicable law would permit a *pro rata* contribution claim, which might exceed both the proportionate share and the *pro tanto* credit.

**163.** 660 F.2d 9 (2d Cir.1981)

**164.** 42 Fed.Appx. 511 (2d Cir.2002).

**165.** 396 F.3d 96.

**166.** Harslem Mem. at 14 (emphasis removed).

**167.** *Wal–Mart Stores,* 396 F.3d at 107–08 (citing *TBK Partners, Ltd. v. Western Union Corp.,* 675 F.2d 456 (2d Cir.1982)).

published summary order) the Second Circuit expanded the reach of this doctrine, holding that *Super Spuds* requires rejection of a settlement which "merely impairs, rather than extinguishes" claims held only by a subset of the class, and arising out of a different factual predicate.[168] The settlement in that case contained a provision which prohibited class members from bringing certain non-class claims in United States courts, though it allowed them to be brought elsewhere. The subset of the class who held those non-class claims received no additional compensation. Although the non-class claims were not extinguished, but only impaired,

> the impairment is an 'uncompensated sacrifice of claims of members . . . which were not within the description of claims assertable by the class.' That the impairment may be slight is of no moment, as we cannot say that it is valueless . . . yet it is exacted without any compensation whatsoever.[169]

This doctrine is not applicable here. Class Members' claims against third parties have not been released, nor, within the meaning of *In re Auction Houses*, impaired without compensation. The Harslem Plaintiffs may still bring their claims against Ernst & Young; the judgment credit provision will only affect their claims against third parties to the extent that plaintiffs have already been compensated for damages arising out of those claims by Jenkens. The contribution law of the majority of states would reduce the Harslem Plaintiffs' claims against third parties even if the settlement contained no judgment credit provision.

If courts were to accept the Harslem Plaintiffs' argument that a judgment credit provision is an impermissible impairment of claims against third parties, this would create a serious obstacle to *any* settlement. There could never be a bar order and judgment credit provision in any partial settlement in which some of the plaintiffs also brought the same claims against different third parties— a not uncommon situation in class actions alleging a conspiracy among multiple defendants. Without the possibility of a bar order, partial settlement in such cases would be extremely unlikely.

The Second Circuit has explained that "at the heart of our concern [in *National Super Spuds*] was the danger that a class representative not sharing common interests with other class members" would sacrifice the interests of those other class members.[170] That is not the case here. The Harslem Plaintiffs' interests with respect to the judgment credit provision are aligned with those of class representatives. The judgment credit provision is part of the price of the settlement for all class members: the settlement fully compensates the Harslem Plaintiffs, like every other class member, for accepting the provision.

### 5. The Government's Objection to Paragraph 14

The Government objects to Paragraph 14 of the proposed order. Paragraph 14 provides that:

> Neither this Judgment, the Stipulation of Settlement, nor any act performed or document executed pursuant to or in furtherance of the Stipulation of Settlement: (i) is or shall be deemed to be or shall be used as an admission of, or evidence of, the validity of any Released Claims or any wrongdoing by or liability of any Released Persons; (ii) is or shall be deemed to be or shall be used as an admission of, or any evidence of, any fault or omissions of any Released Person in any statement, release or written document or financial report issued, filed or made; (iii) shall be offered or received in evidence against any Released Person in any civil, criminal or ad-

---

168. *In re Auction Houses Antitrust Litig.*, 42 Fed. Appx. 511, 519 (2d Cir.2002).

169. *Id.* (quoting *Super Spuds*, 660 F.2d at 19).

170. *TBK Partners, Ltd.*, 675 F.2d at 462. *Accord Wal–Mart Stores*, 396 F.3d at 110–11 (noting that "*Super Spuds* hinged on the fact that the class representatives did not possess the [released claims]" and distinguishing *Super Spuds* on the

basis that lead plaintiffs were also members of the sub-classes whose claims were released, and "their interests are, therefore, aligned with the interests of those classes."); *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F.Supp.2d 503, 514 (E.D.N.Y.2003) ("there is no specter here, as there was in *National Super Spuds*, of settling plaintiffs giving away claims possessed only by absent class members in exchange for the settlement.").

ministrative action or proceeding in any court, administrative agency, arbitral or other tribunal other than such proceedings as may be necessary to consummate or enforce the Stipulation of Settlement, the releases executed pursuant thereto, and/or the Judgment, except that the Stipulation of Settlement and the Judgment and the Exhibits thereto may be filed in the Litigation or in any subsequent action brought against any of the Released Persons in order to support a defense or counterclaim of any Released Person of res judicata, collateral estoppel, release, good faith settlement, judgment bar or reduction, or any other theory of claim or issue preclusion or similar defense or counterclaim, including without limitation specific enforcement of the settlement embodied in the Stipulation of Settlement by way of injunctive relief.

The Government objects to this paragraph on the ground that "it is not appropriate for this or any Court to determine, in the abstract, the admissibility or use of documents or acts in other proceedings." [171]

At the Government's request, the settling parties have inserted language into the proposed judgment which provides that "[n]othing in this Judgment prejudices or limits in any way the right of the Government of the United States to obtain or use information," and furthermore, that "[n]othing in this Judgment or in any agreement of the parties that relates to the admissibility of evidence shall apply to or be binding on the Government or any federal administrative agency, or shall be binding on any court with respect to the Government or any federal administrative agency." [172] The Government concedes that these provisions are sufficient to protect the Government's interests.[173] The Government therefore has no standing to object to paragraph 14. Moreover, the Government offers no authority in support of its objection. Provisions such as paragraph 14 are common in judgments accompanying class action settlements.[174] Such orders may be necessary to encourage settlement.[175] The parties who are most likely to be affected by this provision—non-settling defendants and third parties—have raised no objection to it. The Government's objection is therefore overruled.

## C. Adequacy of the Notice

Rule 23(c)(2)(B) requires that "for any class certified under Rule 23(b)(3), the court must direct to class members the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." [176] The notice must inform each class member of the nature of the action and the class certified, and that "he has the right to exclude himself from the action on request or to enter an appearance through counsel, and further that the judgment, whether favorable or not, will bind all class members not requesting exclusion." [177] It is not necessary that every class member receive actual notice, so long as class counsel acted reasonably in selecting means likely to inform per-

---

**171.** January 24, 2005 Letter to the Court from the Government at 3.

**172.** Proposed Judgment ¶ 15.

**173.** *See* January 24, 2005 Letter to the Court from the Government at 4. *See also* Transcript of January 24, 2005 Fairness Hearing at 60.

**174.** *See, e.g., In re Vitamins Antitrust Litig.*, 305 F.Supp.2d 100, 108 (D.D.C.2004); *Teachers' Retirement System of Louisiana v. A.C.L.N., Ltd.*, No. 01 Civ. 11814, 2004 WL 1087261, at *8 (S.D.N.Y. May 14, 2004); *Galloway v. Southwark Plaza Ltd. P'ship*, No. 01 Civ. 835, 2003 WL 22657200, at *10 (E.D.Pa. Oct. 27, 2003); *Vista Healthplan, Inc. v. Bristol–Myers Squibb Co.*, 287 F.Supp.2d 65, 68 (D.D.C.2003); *Cooper v. Miller Johnson Steichen Kinnard, Inc.*, No. 02 Civ. 1236, 2003 WL 23335321, at *4 (D.Minn. July 22, 2003); *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, No. MDL 1361, 2003 WL

21685581, at *13 (D.Me. July 18, 2003); *In re General Instrument Securities Litigation*, 209 F.Supp.2d 423, 439 (E.D.Pa.2001); *In re Intelligent Electronics*, No. 92 Civ. 1905, 1997 WL 786984, at *3 (E.D.Pa. Nov. 26, 1997).

**175.** *Cf.* Federal Rule of Evidence 408 (providing that evidence of settlement offers, or of conduct or statements made in settlement negotiations, is not admissible to prove liability for or invalidity of the claim or its amount). This rule is grounded principally on the "public policy favoring the compromise and settlement of disputes." Fed. R.Evid. 408 Advisory Committee Note.

**176.** Fed.R.Civ.P. 23(c)(2)(B).

**177.** *Eisen*, 417 U.S. at 173, 94 S.Ct. 2140; Fed. R.Civ.P. 23(c)(2)(B).

sons affected. Rule 23(c)(2)(B) specifies certain information that a class notice in a Rule 23(b)(3) action must contain, including (i) the nature of the case, the class definition, and the claims, issues, or defenses in the action, (ii) class members' right to exclude themselves from the class, (iii) the binding effect of a class judgment on all class members who do not request exclusion, and (iv) class members' right to object to the partial settlement and appear through counsel.[178]

In addition, Rule 23(e)(B) requires that "the court must direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise." [179]

> There are no rigid rules to determine whether a settlement notice to the class satisfies constitutional or Rule 23(e) requirements; the settlement notice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings. Notice is adequate if it may be understood by the average class member.[180]

Due to confidentiality concerns, the notices sent to class members were mailed directly by Jenkens. On June 29, 2004, Jenkens mailed notice to the last known addresses of 1286 persons. This notice clearly stated all of the information required by Rule 23(c)(2)(b). Class members were given 136 days to opt out of the settlement, a more than adequate allowance of time.[181] The notice clearly informed class members of the terms of the settlement.[182] Class Counsel published a Summary Notice in the Wall Street Journal on the same day.

On December 29, 2004, following the amendments to the settlement in December, 2004, Jenkens mailed a supplemental notice to all class members who had not previously opted out. The notice clearly described the nature of the changes to the settlement, and included the original and the amended mediated settlement agreements. The supplemental notice informed class members that the deadline for objections was extended by one week. Simultaneously, Class Counsel published a summary of the notice in the Wall Street Journal. Finally, because the settlement proponents made minor changes to the language of the proposed judgment to accommodate objections, Jenkens, at the Court's instructions and in an excess of caution, mailed a third round of notice to all class members (individually, or to counsel if known), containing the final proposed judgment and extending the time frame for objections.

The notice was thus more than adequate, both procedurally and with respect to its content.

## C. No Further Opt–Out Opportunity Is Required

### 1. Rule 23(e)(3)

■■■ The Harslem, Moore and Mattei plaintiffs ("the objectors") argue that the Court should grant them a second opportunity to opt out. Under the new Rule 23(e)(3), a court is permitted to allow class members a second opportunity to opt out. This is a matter for the Court's discretion; the objectors have failed to show any reason for the Court to exercise its discretion to permit such an opportunity.

The Advisory Committee Note to Rule 23(e)(3) states that "[m]any factors may influence the court's decision [to grant a second opt-out]. Among these are changes in

---

**178.** See Fed.R.Civ.P. 23(c)(2)(b).

**179.** Fed.R.Civ.P. 23(e)(b).

**180.** *Wal–Mart Stores,* 396 F.3d at *113–14 (quotation omitted).

**181.** See *Weinberger v. Kendrick,* 698 F.2d 61, 70 (2d Cir.1982) (holding a six week opt out period to be adequate).

**182.** The Harslem Plaintiffs' argument that the notice did not adequately inform them of the judgment credit provision is without merit. The notice informed them that "Class Members will be required to protect [Jenkens] from liability to other defendants and third parties for contribution.... This will require Class Members who recover a judgment or make other recovery against another defendant or third party to grant the defendant or third party a judgment credit or other form of set-off." June 29 Notice at 9. This language clearly informed class members of the judgment credit provision.

the information available to class members since expiration of the first opportunity to request exclusion." [183] The objectors argue that the information available to them has changed since the expiration of the original opt-out date. However, the proposed settlement has only improved since the June 28 Notice: the settlement fund is now $6.56 million larger, and to be divided among 89 fewer class members. Nevertheless, the objectors argue that the relative attractiveness of opting out has also changed. In the original settlement, no insurance funds were allocated to the defense of opt-out claims; in the amended settlement, the insurers have set aside $25 million (with the possibility of another $25 million in reinstated coverage) to defend or settle the claims of opt-outs. Therefore, the objectors argue that opting out now presents a more attractive prospect.

Rule 23(e)(3) was not meant to require an automatic second opt-out whenever a proposed settlement is amended after the close of the first opt-out period. The Advisory Committee Note makes it clear that a change in information about the settlement is only one factor to be considered in informing the exercise of the court's discretion. Rule 23(e)(3) was intended to be applied sparingly, to a limited number of cases, and in particular to cases where the first opt-out period closed prior to reaching a settlement:

> The rules committees also believe that providing a second opt-out opportunity in a limited number of cases, when warranted, will not be unduly disruptive to settlement. It will make a difference only in cases in which the class is certified and the initial opt-out period expires before a settlement agreement is reached. It is irrelevant in

the many cases in which a settlement agreement is submitted to the court simultaneously with a request that a class be certified. In the cases in which it might be used, moreover, the court retains broad discretion.[184]

Both before and after the 2003 amendments, courts have consistently rejected arguments that due process *requires* a second opportunity to opt out when the final terms of a proposed settlement become known— even in those cases where the initial opt-out period expires before a settlement agreement is reached.[185] "[T]o hold that due process requires a second opportunity to opt out after the terms of the settlement have been disclosed to the class would impede the settlement process so favored in the law." [186] Rule 23(e)(3) was not intended to alter this sound policy by mandating a second opt out opportunity every time parties renegotiate their settlement in any respect.

Here, the June 28 Notice clearly apprised all class members of the terms of the settlement. There has been no material change in the settlement adverse to the class: the proposed settlement has only improved since the June 28 Notice. The fact that Jenkens has subsequently negotiated with its insurers for money to defend the claims of opt-outs is a matter outside the proposed settlement, and cannot justify a new opt-out period. A number of class members, with the same information as Objectors, took the gamble of opting out prior to the close of the first period, taking the risk that Jenkens would be unable to find resources to meet their claims; Objectors chose not to take that risk.

Objectors are a tiny minority of the class, who chose not to opt out of the class in a

---

183. Fed.R.Civ.P. 23(e)(3) Advisory Committee Note.

184. *See* Comm. on Rules of Practice & Procedure, Agenda F–18 (Appendix D, Proposed Rule Amendments of Significant Interest) (2002) (available at http:// www.uscourts.gov/rules/supct1202/ controversial.pdf).

185. *See, e.g., In re Lloyd's Am. Trust Fund Litig.*, 2002 WL 31663577, at *12 ("Due process requires only that Class Members have notice of the proposed settlement and an opportunity to be heard at a fairness hearing. If the proposed settlement is fair, adequate and reasonable, due process does not afford Class Members a second opportunity to opt out."). *See also In re Visa*

*Check/Mastermoney Antitrust Litig.*, 297 F.Supp.2d at 518 n. 18 ("[Objectors] requested that Class members be given a second opportunity [under the new Rule 23(e)(3), which had taken effect eighteen days prior to the court's decision] to opt out of the Class now that the Settlements' terms are known. Because I have approved these Settlements as fair, however, due process does not afford Class members a second opportunity to opt out.") (citation omitted).

186. *Officers for Justice v. Civil Serv. Comm'n of the City and County of San Francisco*, 688 F.2d 615, 635 (9th Cir.1982).

timely manner.[187] If the Court were to grant a second opt out opportunity, the resulting delay and uncertainty would pose significant risks of killing the settlement and driving Jenkens into bankruptcy, depriving the vast majority of the class of the benefits of settlement. The Objectors' request for a second opt out opportunity pursuant to Rule 23(e)(3) is therefore denied.[188]

### 2. Excusable Neglect

■ Claiming "excusable neglect," certain objectors ask that the Court permit them to opt out of the class on an individual basis. They argue that their failure to opt out in a timely fashion should be excused because they failed to comprehend the judgment credit provision as described in the notice, and because the information on which they relied in choosing to remain in the class has changed since the end of the first opt out period.

Pursuant to Rule 60(b)(1), Rule 60(b)(2), and Rule 23(d), courts have the power to grant an extension of the time to opt out on a showing of "excusable neglect."[189] The movant must show "both good faith and a reasonable basis for not acting within the specified period."[190] "Even upon a finding of excusable neglect, it remains within the district court's sole discretion whether or not to grant the extension."[191] Courts rarely grant such extensions, recognizing that "granting leave to file untimely exclusions would undermine the finality of judgments entered there-

in and would discourage settlement of such actions. Defendants would be loath to offer substantial sums of money in compromise settlements of class actions unless they can rely on the notice provisions of Rule 23 to bind class members."[192] So, for example, courts have refused to permit an extension of the opt-out period on the basis of "excusable neglect" even in cases where a class member never received notice, so long as the notice was sent out by means that comport with due process.[193]

Objectors have failed to show excusable neglect. The notice clearly stated that the settlement would impose a judgment credit in actions against non-settling defendants and third parties. Objectors' failure to comprehend that provision—even if genuine and in good faith—does not constitute excusable neglect. Objectors' argument that they should be permitted to opt out because of changes to the settlement's terms is more properly treated as a request for a general second opt-out opportunity for the class as a whole under Rule 23(e)(3); to the extent the available information has changed, it has changed for the entire class, not simply objectors. Objectors' request is therefore denied.

### 3. Preliminary Certification Was Proper

■ At the Fairness Hearing, the Mattei Plaintiffs raised a third argument for a second opt-out opportunity.[194] The original notice to the class was sent out pursuant to the Court's May 2004 order *preliminarily* certi-

---

**187.** *See In re Visa Check/Mastermoney Antitrust Litig.*, 297 F.Supp.2d at 518 n. 18 (declining to exercise discretion under Rule 23(e)(3) to grant second opt-out opportunity in part "in light of the infinitesimal number of objections.").

**188.** I note also that the Harslem Plaintiffs sought a belated opportunity to opt out on the basis of excusable neglect in December 2004 (prior to the amendment of the settlement), claiming that they had failed to comprehend the judgment credit provision. *See* December 2, 2004 Letter to the Court of Steven Spielvogel, counsel to the Harslem Plaintiffs. The Harslems therefore cannot credibly claim that they wish to opt out now because new information about the amended settlement has become available.

**189.** *In re Prudential Secs. Ltd. P'shps. Litig.*, 164 F.R.D. 362, 368–69 (S.D.N.Y.1996).

**190.** *Id.*

**191.** *Id.* (citing *In re Four Seasons Sec. Laws Litig.*, 493 F.2d 1288 (10th Cir.1974) and *Supermarkets General Corp. v. Grinnell*, 490 F.2d 1183 (2d Cir.1974)).

**192.** *In re Prudential Secs. Ltd. P'shps. Litig.*, 164 F.R.D. at 368–69. *Accord In re VMS Ltd. P'shp. Secs. Litig.*, No. 90 C 2412, 1995 WL 355722, at *2 (D.Ill. June 12, 1995) ("courts will not act under Rule 60(b)(6) unless extraordinary circumstances are present.... A too liberal application of Rule 60(b) in class actions would undermine the finality of judgments entered therein and would discourage settlement of such actions.").

**193.** *See In re VMS P'ship Secs. Litig.*, 1995 WL 355722, at *2.

**194.** *See* Transcript of January 24, 2005 Fairness Hearing at 35–36.

fying the class. The Mattei Plaintiffs argue that, following the 2003 amendments to Rule 23, a court no longer has the power to preliminarily certify a settlement class; therefore, the previous notice and opt-out period was ineffective, and the Court must grant a new notice and opt-out period when the class is finally certified. The Mattei Plaintiffs' argument is creative, but unavailing.

Prior to the 2003 Amendments, Rule 23(c)(1) stated that "[a]s soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subdivision may be conditional." The 2003 amendments to Rule 23(c)(1)(C) deleted the provision that a class certification "may be conditional." The Advisory Committee Note explains that "[a] court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until they have been met." [195]

Courts have frequently certified settlement classes on a preliminary basis, at the same time as the preliminary approval of the fairness of the settlement, and solely for the purposes of settlement, deferring final certification of the class until after the fairness hearing.[196] Courts have continued to follow this procedure even after the 2003 amendments came into effect on December 1, 2003.[197] The Manual for Complex Litigation continues to recognize the practice,[198] as do other authorities.[199] In deleting the reference to "conditional" certification, the Committee did not intend to abolish this common and vital practice. The amendment was directed at different problems. The Advisory Committee's report described its concern: "[t]he provision for conditional class certification is deleted to avoid the unintended suggestion, which some courts have adopted, that class certification may be granted on a tentative basis, even if it is unclear that the rule requirements are satisfied." [200] The Committee was troubled by the "fear that emphasis on the conditional nature of a certification order will encourage some courts to grant certification without searching inquiry, relying on later developments to determine whether certification is in fact appropriate." [201]

**195.** Fed.R.Civ.P. 23(c)(1)(C) Advisory Committee Note.

**196.** *See Weinberger*, 698 F.2d at 72 (discussing the practice of sending "simultaneous notice of the pendency of a class action and of a proposed settlement to prospective class members" and concluding that, despite certain misgivings, and the need for heightened scrutiny to protect against collusion, "[a] blanket rule prohibiting the use of temporary settlement classes … does not appear necessary or desirable…. Temporary settlement classes have proved to be quite useful in resolving major class action disputes [and] most courts have recognized their utility.").

**197.** *See, e.g., Sylvester v. Cigna Corp.*, 225 F.R.D. 391 (D.Me.2005); *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288, 2005 WL 78807 (S.D.N.Y. Jan. 11, 2005); *In re Lupron (R) Mktg. & Sales Practices Litig.*, 345 F.Supp.2d 135 (D.Mass. 2004); *Yong Soon Oh v. AT & T Corp.*, 224 F.R.D. 357 (D.N.J.2004); *In re Lutheran Bhd. Variable Ins. Prods. Co. Sales Practices Litig.*, No. 99 MDL 1309, 2004 WL 2931352 (D.Minn. Dec. 16, 2004); *Medina v. Manufacturer's & Traders Trust Co.*, No. 04 C 2175, 2004 WL 3119019, at *1 (D.Ill. Dec. 14, 2004) (noting conditional certification on December 8, 2003 in related, prior action); *Global Crossing Sec.*, 225 F.R.D. 436; *In re Serzone Prods. Liab. Litig.*, No. MDL 1477, 2004 WL 2849197 (S.D.W.Va. Nov. 18, 2004); *McDaniel v. Universal Fid. Corp.*, No. 04 C 2157, 2004 U.S. Dist. LEXIS 21320 (D.Ill. Oct. 21,

2004); *Latino Officers Ass'n City of New York, Inc. v. City of New York*, No. 99 Civ. 9568, 2004 WL 2066605 (S.D.N.Y. Sep. 15, 2004); *Moore v. Halliburton Co.*, No. 3:02–CV–1152, 2004 WL 2092019 (D.Tex. Sept. 9, 2004); *Serventi v. Bucks Technical High School*, 225 F.R.D. 159 (E.D.Pa. 2004); *Klabo v. Myhre*, No. 3:02–CV–0877, 2004 WL 554794 (D.Ind. Feb. 6, 2004); *In re The St. Paul Companies, Inc. Sec. Litig.*, No. 02 Civ. 3825, 2004 WL 1459426 (D.Minn. June 7, 2004).

**198.** *See* Manual § 21.612 (observing that "[s]ettlement classes—classes certified as class actions solely for settlement—can provide significant benefits to class members …"). *See also id.* § 21.633 (calling for a "preliminary determination" of certifiability in connection with preliminary approval of the settlement). The fourth edition of the Manual went to press before the 2003 Amendments took effect, but the text reflects the amendments. *See id.* at 2.

**199.** *See* 5–23 Moore's Federal Practice—Civil § 23.161.

**200.** Comm. on Rules of Practice & Procedure, Agenda F–18: Report of the Judicial Conference 8–21 (Sept.2002) (available at http://www.uscourts. gov/rules/jc09–2002/Report.pdf).

**201.** Comm. on Rules of Practice & Procedure, Report of the Civil Rules Advisory Committee

Rule 23 directs courts to make a decision as to certification "at an early practicable time."[202] The Second Circuit has explained that "[t]he reason for this rule is plain: fundamental fairness requires that a defendant named in a suit be told promptly the number of parties to whom it may ultimately be liable for money damages."[203] The Second Circuit has noted "the onerous effect of failing to decide class certification promptly, finding that a district court's failure to decide class certification 'early in the proceedings not only produced below an atmosphere of confusion, but also made [its] appellate review more difficult.' "[204]

For these reasons, the Committee was concerned that the conditional certification option might encourage courts to delay undertaking the rigorous analysis required by Rule 23 prior to reaching a certification decision, instead taking the "approach of certify now and worry later."[205] This practice often resulted in confusion and unfairness.[206] Different considerations apply, however, in the context of a settlement class. Where settling defendants and plaintiffs both support certification, there is little danger in a preliminary certification that defers a final certification decision until after the fairness hearing. Preliminary certification of a settlement-only class is not an end-run around a court's duty to conduct a rigorous analysis of the propriety of certification; rather, it is an essential part of the settlement process, and an indispensable tool for the efficient management of complex litigation.

When a court is presented with a motion for preliminary certification and approval of a proposed settlement, the merits of certification are bound up with the proposed settlement. The *Amchem* court recognized and accepted the concept of a settlement class, acknowledging that due to the complexity of the class members' claims such a class might not be certifiable in the absence of a settlement because the litigation would not be manageable. Courts must therefore have the ability to preliminarily certify settlement classes that could not be certified if the settlement fails and the case proceeds to trial. At the preliminary approval stage, the settlement is unopposed. The court is not in a good position to make a final decision as to settlement (and therefore certification), because the court has yet not heard any objections.[207] Moreover, after the opt-out period has expired, the settlement's proponents may wish to abandon the settlement or renegotiate the terms; the settlement cannot be fully assessed until the opt-out and objection period has closed. The position advanced by the objectors here would require a court to order final certification of a settlement class, long before it is able to give final approval to the settlement. This makes little sense, as the propriety of certification may depend on whether there is a viable settlement.[208]

(May 20, 2002) (available at http://www.uscourts.gov/rules/supct1202/CVReport-final.pdf).

**202.** Fed.R.Civ.P. 23(c)(1)(A). Prior to 2003, the Rule stated that the certification decision should be made "as soon as practicable after the commencement of an action." The 2003 amendment to Rule 23(c)(1)(A) recognized that there are sometimes legitimate reasons to defer certification; nevertheless, the certification decision should not be "unjustifiably delayed." Fed.R.Civ.P. 23(c)(1)(A) Advisory Committee Note.

**203.** *Siskind v. Sperry Ret. Program,* 47 F.3d 498, 503 (2d Cir.1995).

**204.** *In re Philip Morris Inc. v. National Asbestos Workers Med. Fund,* 214 F.3d 132 (2d Cir.2000) (quoting *Henry v. Gross,* 803 F.2d 757, 769 (2d Cir.1986)).

**205.** *Southwestern Refining Co., Inc. v. Bernal,* 22 S.W.3d 425, 435 (Tex.2000) (criticizing the practice of certifying classes without performing an analysis of the predominance requirement, or where predominance is in doubt, on the assumption that certification may be withdrawn later, or

even "postulat[ing] that because a settlement or a verdict for the defendant on the common issues could end the litigation before any individual issues would be raised, predominance need not be evaluated until later.").

**206.** *See* 5–23 Moore's Federal Practice—Civil § 23.45 (noting, in particular, that "a number of cases purported to certify classes conditionally, and left for a later time the determination whether the laws of the relevant states were too divergent to permit a finding that common issues predominated.").

**207.** *See In re Lupron (R) Mktg. & Sales Practices Litig.,* 345 F.Supp.2d at 137 ("I see no practical way to ascertain the fairness of the proposed settlement to the consumer class other than by proceeding with conditional class certification and giving notice with the opportunity for its members to opt in or out of the settlement.").

**208.** And, indeed, the amended Rule 23 continues to recognize that a court's decision to certify a class "may be altered or amended before final

The parties also need the flexibility of moving for certification on a preliminary basis. Settling defendants, in particular, must be able to support certification of a settlement class, while being free to oppose certification for litigation purposes if the settlement collapses.[209] If this Court adopted the argument pressed by the objectors, defendants would be required to seek a final and binding certification of the class prior to the onset of the opt-out period and before any objections, taking the risk that the objections may convince the court to reject the settlement, or that opt-outs may be numerous enough to make settlement worthless. This would be a disincentive to settlement.

These policy considerations explain why, *in the settlement context,* courts regularly make a preliminary determination as to the propriety of certification, at the same time as the preliminary approval of a proposed settlement, postponing the final decision on certification until the court is ready to evaluate the settlement. These considerations further explain why courts have continued the practice of preliminary certification *of settlement classes,* despite the 2003 Amendments' disapproval of conditional certification.[210]

On the other hand, the 2003 amendments should prevent one particularly troubling practice engaged in by some courts. As one leading authority has explained:

> In the past, the term "settlement class" was misused to refer to a temporary class approved by the court on a conditional basis, *for the limited purpose of conducting settlement negotiations.* Courts that made use of this unrecognized type of "set-

tlement class" tentatively assumed the existence of a class in order to permit the parties to *negotiate a settlement;* and those courts would "conditionally" certify a class without the thorough certification analysis required by Rules 23(a) and (b). Because those courts indulged in the assumption of the class's existence only until a settlement was reached or the parties abandoned the negotiations, those classes were sometimes referred to as "temporary" or "provisional" classes.[211]

This practice is to be avoided. Assuming the existence of a class, without conducting any preliminary inquiry into whether the Rule 23 requirements are satisfied, in order to permit the parties to engage in "open-ended settlement negotiations" will undoubtedly delay the certification decision.[212] The same authority, however, explicitly recognizes the practice followed in this case.

A true "settlement class" arises when the named parties to an uncertified class action reach a provisional settlement that they wish to make binding on the class as a whole. In those cases, the parties move the court for simultaneous class certification and approval of the settlement. Typically, the court then orders a combined notice of the certification, opt-out rights, and the proposed settlement, and combines the fairness hearing on the proposed settlement with a hearing on class certification. If the settlement is approved and the class is certified, absent class members who do not opt out are bound by the settlement agreement.[213]

---

judgment." Fed.R.Civ.P. 23(c)(1)(C). Thus, certification is always contingent on subsequent events and information that may require the court to revisit its decision.

**209.** *See* Manual § 21.612. *See also Carnegie,* 376 F.3d at 656 (holding that a defendant who urges a court to certify a class for settlement, and prevails, may later contest certification for litigation if the settlement fails, but only as to manageability).

**210.** I am not blind to the countervailing considerations. In particular, where the final determination of certification is postponed until after the close of the opt-out and objection period, the settlement has "momentum" and a court is under great pressure to accept it as a *fait accompli.* The answer to this problem is that courts must

conduct the required rigorous analysis, despite this pressure.

**211.** 5–23 Moore's Federal Practice—Civil § 23.161 (emphasis added).

**212.** *See id.*

**213.** *Id.* (citing *In re GMC Pick–Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 778 (3d Cir.1995))("the court disseminates notice of the proposed settlement and fairness hearing at the same time it notifies class members of the pendency of class action determination. Only when the settlement is about to be finally approved does the court formally certify the class, thus binding the interests of its members by the settlement.").

In sum: the 2003 amendments to Rule 23 were not intended to prohibit the practice of preliminary certification of settlement-only classes, with final certification to follow after the fairness hearing. However, the amendments *were* intended to emphasize that, even at the stage of preliminary certification, courts should conduct a rigorous Rule 23 analysis. A court should never merely *assume* the existence of a class.

I have discussed this rather technical issue at length because of the recent change to Rule 23 eliminating conditional certification. The important issue from the perspective of the objectors, however, is whether the notice they received provided them with due process. As noted earlier, the notice sent to all putative class members was sufficient in all respects; whether the May 14 Order was preliminary or final does not affect the quality of the notice. The objectors, like other class members, had all the information they needed to make an informed decision as to whether to opt out or remain in the class; they chose to remain in the class and are properly bound by that decision. I have scrutinized the settlement and found it to be fair, reasonable, and adequate, and not a product of collusion or undue pressure. To permit the Mattei Plaintiffs now to opt out of a settlement of which they had full notice (risking the settlement for the overwhelming majority of class members) merely because the class certification was preliminary rather than final would elevate form over substance.

## D. Attorney's Fees

### 1. General Principles

■ The "equitable" or "common fund" doctrine governing awards of attorneys' fees was established more than a century ago in *Trustees v. Greenough*.[214] Where an attorney succeeds in creating a common fund for the benefit of a class of plaintiffs, that attorney is entitled to a reasonable fee to be set by the court and taken from the fund.[215]

While an award of attorneys' fees is justified by the common fund doctrine, the amount of "fees awarded in common fund cases [must] not exceed what is 'reasonable' under the circumstances."[216] Furthermore "[w]hat constitutes a reasonable fee is properly committed to the sound discretion of the district court ... and will not be overturned absent an abuse of discretion, such as a mistake of law or a clearly erroneous factual finding."[217]

Both the lodestar and percentage of fund methods are available in calculating fee awards in class action settlements.[218] The lodestar method multiplies the number of hours reasonably expended by a reasonable hourly rate for attorneys of similar skill within a given geographic location.[219] "Courts in their discretion may increase the lodestar by applying a multiplier based on factors such as the riskiness of the litigation and the quality of the attorneys."[220] The percentage of fund method is a simpler calculation in that the award is "some percentage of the fund created for the benefit of the class."[221]

**214.** 105 U.S. 527, 533, 26 L.Ed. 1157 (1881).

**215.** *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980) ("The [common fund] doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense.")

**216.** *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 47 (2d Cir.2000).

**217.** *Id.* (internal citation omitted).

**218.** *See id.* at 50.

**219.** *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986).

**220.** *Wal–Mart Stores*, 396 F.3d at 120–21 ("The multiplier takes into account the realities of a legal practice by rewarding counsel for those successful cases in which the probability of suc-

cess was slight and yet the time invested in the case was substantial.... As the chance of success on the merits or by settlement increases, the justification for using a risk multiplier decreases."). *Accord In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 226, 236 (2d Cir.1987) (citations omitted).

**221.** *Savoie v. Merchants Bank*, 166 F.3d 456, 460 (2d Cir.1999) (citing *Blum v. Stenson*, 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)). While the simplicity of the percentage of fund method may be initially appealing, the lodestar figure should be used to cross-check the reasonableness of the fees determined under the percentage of fund method. *See Goldberger*, 209 F.3d at 50 ("[W]e encourage the practice of requiring documentation of hours as a 'cross check' on the reasonableness of the requested percentage.... [W]here used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court.").

 Despite the availability of both methods, "the trend in this Circuit is toward the percentage method."[222] Regardless of which method is used, the following *Goldberger* factors determine the reasonableness of a fee award:

(1) the time and labor expended by counsel;

(2) the magnitude and complexities of the litigation;

(3) the risk of the litigation . . .;

(4) the quality of representation;

(5) the requested fee in relation to the settlement; and

(6) public policy considerations.[223]

 Furthermore, "the percentage used in calculating any given fee award must follow a sliding-scale and must bear an inverse relationship to the amount of the settlement. Otherwise, those law firms who obtain huge settlements, whether by happenstance or skill, will be over-compensated to the detriment of the class members they represent."[224] While the *Goldberger* court recognized the ever increasing use of benchmarks within the 25% range, it cautioned that the use of such benchmarks "could easily lead to routine windfalls where the recovered fund runs into the multi-millions."[225] In cases with recoveries of between $50 and $75 million, courts have traditionally awarded fees in the range of 12% to 20%.[226] Case citations are of limited usefulness, however, as a "fee award should be assessed based on scrutiny of the unique circumstances of each case."[227]

### 2. Application of the *Goldberger* Factors

Lead Class Counsel, on their own behalf and on behalf of Other Class Counsel Counsel, seek attorneys' fees of $16,310,000 and expenses of $624,484.84. The requested attorneys' fee award alone represents approximately 20% of the $81,557,805 Settlement and is equivalent to 2.04 times the lodestar figure of $7,990,643.50.[228] Lead Counsel argue that such an award is justified based upon the *Goldberger* factors.

### a. The Time and Labor Expended by Counsel

Plaintiffs' allegations required extensive pre-filing investigatory work by counsel. Class Counsel undertook an extensive investigation of the tax shelter business and analysis of the applicable law as well as widespread consultation with tax advisors and other experts. The result was the filing of the *Denney* and *Camferdam* class actions.

Five law firms devoted almost 18,800 hours of professional time to investigating, prosecuting and settling the claims. Lead Counsel have been consumed with the litigation and settlement of these two class actions. The following is a list of some of the tasks Lead Class Counsel performed in connection with this litigation:

Interviewed Class Members and their tax advisors

**222.** *Wal–Mart Stores,* 396 F.3d at 120–21.

**223.** *Goldberger,* 209 F.3d at 50 (internal quotation marks and citation omitted).

**224.** *In re Indep. Energy Holdings PLC,* No. 00 Civ. 6689, 2003 WL 22244676, at *6 (S.D.N.Y. Sept. 29, 2003).

**225.** *Goldberger,* 209 F.3d at 52.

**226.** *See, e.g., In re Twinlab Corp. Sec. Litig.,* 187 F.Supp.2d 80, 88 (E.D.N.Y.2002) (12% of $26,500,000); *In re Dreyfus Aggressive Growth Mut. Fund Litig.,* No. 98 Civ. 4318, 2001 WL 709262, at *7 (S.D.N.Y. June 22, 2001) (15% of $18,500,000); *In re Fine Host Corp. Sec. Litig.,* No. MDL 1241, 2000 WL 33116538, at *6 (D.Conn. Nov. 8, 2000) (17.5% of $17,750,000); *Varljen v. H.J. Meyers & Co., Inc.,* No. 97 Civ. 6742, 2000 WL 1683656, at *5 (S.D.N.Y. Nov. 8, 2000) (20% of $5,000,000); *In re Health Mgmt.*

*Sec. Litig.,* 113 F.Supp.2d 613, 614 (S.D.N.Y. 2000) (20% of $4,500,000). *See also In re Arakis Energy Corp. Sec. Litig.,* No. 95 CV 3431, 2001 WL 1590512, at *9 (E.D.N.Y. Oct. 31, 2001) ("[T]he trend within this circuit after *Goldberger* has been to award attorney's fees in amounts considerably less than 30% of common funds in securities class actions, even where there is a substantial contingency risk.") (citing cases).

**227.** *Goldberger,* 209 F.3d at 53.

**228.** This lodestar figure is comprised of the following: $5,173,025 from Deary Montgomery DeFeo & Canada, LLP; $1,549,350 from Cory Watson Crowder & DeGaris, P.C.; $972,483.50 from Whatley Drake, LLC; and $295,785 from Stephen F. Malouf, Esq. *See* Additional Evidentiary Support For Class Representatives' Motion For Final Approval Of Class Settlement, Final Certification Of The Class And Award Of Attorneys' Fees And Costs.

Reviewed and analyzed class members' documents

Researched and analyzed relevant law and legal issues

Identified and analyzed defendants' liability and damages for Class Members' claims

Briefed substantial motions and participated in numerous oral arguments

Prepared discovery

Participated in extensive settlement negotiations, including four lengthy mediation sessions

Held extensive conferences with Class Members and their counsel

Reviewed and analyzed over 200,000 documents produced by the J & G Defendants pursuant to the informal "merits" discovery provision of the settlement agreement

Conducted extensive interviews of the Jenkens & Gilchrist defendants as part of the financial "confirmatory" discovery

Reviewed and analyzed financial documents produced by the J & G Defendants as well as Jenkens & Gilchrist's insurance policies

Retained and consulted with tax advisers and other experts

In short, Class Counsel vigorously and efficiently litigated this case and were successful in reaching a global settlement agreement that is reasonably beneficial to the plaintiff class.

### b. The Magnitude and Complexity of the Case

This action was complex not only in terms of the procedural requirements associated with major class actions, but the underlying substantive claims involved complicated tax strategies. Class Counsel had to expend significant time learning the complicated tax shelter business in order to prosecute plaintiffs' claims. To succeed, Class Counsel had to understand very sophisticated tax issues. Prosecution of this action was heavily dependent on expert testimony, thereby adding to the complexity of the case. In sum, this is undoubtedly a complex class action litigation.

### c. The Risk of the Litigation

There was a significant risk that absent a class settlement with Jenkens, the vast majority of Class Members would have recovered nothing from this defendant. This was due, in part, to significant issues regarding defendants' insurance coverage. Another risk was that the pressure of this litigation would force Jenkens to dissolve and file for bankruptcy, thereby frustrating any potential recovery. Thus, two separate sources of risk made the chance of recovering any damages from Jenkens especially speculative.

### d. Remaining *Goldberger* Factors

The fourth *Goldberger* factor—the quality of Class Counsel's representation—is not an issue here as this case was well litigated by very skilled lawyers. Not only did their skill and expertise contribute to the favorable settlement for the class, it contributed to the overall efficiency of the case. The sixth factor is also not an issue as the success of this case should deter others from engaging in this sort of conduct in the future, which benefits society as a whole.

As to the fifth factor, counsel seek an award of fees and expenses totaling $16,936,084.84 which represents 20.8% of the total Settlement of $81,557,805. This combined award includes attorneys' fees of $16,311,600 which is 20% of the Settlement. While these percentages are not *per se* unreasonable, although they are at this highest end of the 12 to 20% range of reasonable for settlements in the range of $50 to 70 million, the resulting attorneys' fee award is 2.04 times the lodestar figure of $7,990,643.50. Under the particular circumstances of this case, a multiplier of 2.04 is excessive. Accordingly, the fee award as a percentage of the settlement must be reduced to bring the resulting multiplier in line with what is reasonable.

### 3. The Lodestar Cross–Check

A review of the lodestar computations for the various firms reveals a disproportionate ratio of partner to associate hours expended in this litigation. For example, Deary Montgomery DeFeo & Canada expended 11,413 attorney hours in total. The total number of hours by partners and local counsel billing at $525 per hour is 7,499, which represents approximately 66% of the total. Cory Watson Crowder & DeGaris, P.C. logged in a total of 3,101 attorney hours, 1,947 hours of which are from a partner billing at $525 per

hour. That firm's partner hours make up nearly 63% of total attorney hours. Whatley Drake's attorney hours total 2,225.90, of which 910.90 are attributable to partners billing at $550 per hour. At that firm, partner hours constitute approximately 41% of total attorney hours. Finally, all of Stephen F. Malouf's time, totaling 563.4 hours, was billed at his hourly rate of $525 per hour.

The above analysis reveals that the partners at the firms comprising Class Counsel did not delegate as much of the work to associates as they might have.[229] Thus, the resulting lodestar figure of $7,990,643.50 is somewhat inflated. To permit a fee award amounting to 2.04 times this inflated lodestar figure would be a disservice to the plaintiff class. Indeed, one would be hard pressed to conclude that Class Members would agree to compensate a majority of the work performed at $1,071 per hour, which is what a 2.04 multiplier would do. I therefore conclude that a multiplier of 1.5 is more appropriate under the circumstances. Applying this multiplier to the lodestar figure results in an attorneys' fee award of $11,985,965, which is approximately 15% of the Settlement. Added to this is an award of $624,484.84 for counsel's unreimbursed expenses.[230]

Accordingly, the total award for attorneys' fees and expenses is $12,610,449.84, which represents approximately 15.5% of the total Settlement funds, which is well within the range of 12 to 20% referred to earlier. The total award includes attorneys's fees of $11,985,965 and unreimbursed expenses of $624,484.84.[231] While the total award is $4,324,035 less than the total amount requested of $16,934,484.84, it is more than sufficient to compensate the attorneys for their labor and their assumption of risk at the beginning of this litigation. As aptly stated by Judge John Gleeson in the Visa Check/Mastermoney litigation, "[i]f [this] amounts to punishment, I am confident there will be many attempts to self-inflict similar punishment in future cases."[232]

### 4. The Harslem Plaintiffs' Request For Fees

■ Counsel for the Harslem Plaintiffs, the firm of Bondurant, Mixson & Elmore, LLP ("Bondurant"), request that a portion of the fee award, in the range of 1.5% of the fund awarded to class counsel, be allocated to them. For the following reasons, Bondurant is entitled to a fee, although not in the amount requested.

It is well settled that objectors have a valuable and important role to perform in policing class action settlements.[233] Accordingly, "they are entitled to an allowance as compensation for attorneys' fees and expenses where a proper showing has been made that the settlement was improved as a result of their efforts."[234] Courts may also consider whether the objectors "aided the court and enhanced the adversarial process by generating debate about issues relating to the proposed settlement which otherwise would not have been discussed."[235] "The

229. *See In re Dreyfus,* 2001 WL 709262, at *7 ("[A]t most firms partners play a largely supervisory role, while the basic work on the case is performed by more junior staff who bill at lower rates.").

230. *See Miltland Raleigh–Durham v. Myers,* 840 F.Supp. 235, 239 (S.D.N.Y.1993) ("Attorneys may be compensated for reasonable out-of-pocket expenses incurred and customarily charged to their clients....").

231. $81,665 of this sum is to be allocated to counsel for the Harslems, reducing the total award to class counsel to $12,528,784. *See infra* Part IV.D.4.

232. *In re Visa Check/Mastermoney Antitrust Litig.,* 297 F.Supp.2d at 525.

233. *See White v. Auerbach,* 500 F.2d 822, 828 (2d Cir.1974).

234. *Id.*

235. *Great Neck Capital Appreciation Inv. P'ship, L.P. v. Pricewaterhousecoopers, L.L.P.,* 212 F.R.D. 400, 413 (E.D.Wis.2002) (citing *White,* 500 F.2d at 828). *Accord In re Visa Check/MasterMoney Antitrust Litig.,* No. 96 Civ. 5283, 2004 U.S. Dist. LEXIS 8729, at *5 (E.D.N.Y. Apr. 27, 2004) ("Although it is true that the objectors' briefings did not drive my decision to reduce Lead Counsel's request for fees, their arguments did sharpen the debate by introducing contrary case law, and by requiring Lead Counsel to more fully brief the issue in reply papers. In short, the objectors' contribution was to make the proceedings more adversarial."); *In re Domestic Air Transp. Antitrust Litig.,* 148 F.R.D. 297, 359 (N.D.Ga.1993) (awarding fees to objectors who "significantly refined the issues germane to a consideration of the fairness of this complex settlement and[] transformed the settlement hearing into a truly adversarial proceeding").

trial judge has broad discretion in deciding whether, and in what amount, attorneys' fees should be awarded, since she is in the best position to determine whether the participation of objectors assisted the court and enhanced the recovery." [236]

Counsel for the Harslems both enhanced the adversarial process, and secured benefits for the class. The Harslems raised a number of significant objections to the settlement and to the propriety of certification. While their objections were ultimately unsuccessful, they served to generate debate and focus the issues before the Court. For example, their objections to the proposed judgment credit helped to refine the parties' and the Court's understanding of this important provision. The Harslems' objections conferred a benefit on the class by forcing the settling parties to clarify the judgment credit provision, removing certain ambiguities that might have worked to the detriment of class members in subsequent proceedings.

Bondurant is therefore entitled to some compensation. However, the suggested award of 1.5% of the fund awarded to class counsel is excessive. The lodestar value of Bondurant's services is $54,615. Bondurant also incurred expenses of $49,917, for a total in fees and expenses of $104,532.90.[237] An award of 1.5% of the fund awarded to class counsel would amount to $179,784, representing 3.3 times the lodestar value of Bondurant's services, and 1.7 times the combined value of fees and expenses. There is no justification for granting the Harslems' counsel a significantly higher award, relative to their time and expenses, than class counsel. Bondurant did not bear the risk and the expense of the months of intense negotiations leading to this settlement; instead, it "argued the nuances of the settlement during the twilight of this litigation." [238] Although

objectors benefitted the class by clarifying ambiguities in the judgment credit provision, they did not achieve any substantive improvements in the settlement. "An appropriate fee award for objectors under these circumstances would compensate counsel for the reasonable fees and expenses actually accrued in pursuit of their objections, nothing more." [239]

"The fee applicant has the burden of establishing the reasonableness of the expenses it seeks to recover; therefore, a failure to itemize the reasons for substantial expenditures is grounds for a reduction in the amount of an expense award." [240] By far the most substantial of the expenses claimed by Bondurant is the cost of retaining local counsel. This alone accounts for $45,734, and is approximated without any itemization or support. It is impossible for the Court to determine the reasonableness of this expense. On its face, $45,734 appears excessive: the work of drafting the Harslems' objections appears to have been done largely if not entirely by Bondurant.[241] Nevertheless, some of Bondurant's expenditure on local counsel was surely reasonable. I will therefore reduce the requested sum by 50%.[242] This results in a total award of fees and expenses of $81,665.

The settlement fund for the class is reasonable, but, as a result of Jenkens' vulnerable condition, not particularly generous. As a result, I conclude that the burden of paying the Harslems' fees and expenses should not fall on the class. Accordingly, $81,665 of the $12,610,449.84 award of attorney's fees and expenses is to be allocated to counsel for the Harslems.

### 5. Incentive Awards

■ Plaintiff request a "modest incentive award" of $10,000 for each of the individual

---

**236.** *White,* 500 F.2d at 828.

**237.** These figures do not include time spent on seeking to opt out of the settlement.

**238.** *In re Domestic Air Transp. Antitrust Litig.,* 148 F.R.D. at 359.

**239.** *Id.*

**240.** *In re Excess Value Ins. Coverage Litig.,* No. M–21–84, 2004 U.S. Dist. LEXIS 24368, at *18 (S.D.N.Y.2004).

**241.** *See* Affidavit of H. Lamar Mixson, Harslems' counsel, in support of fee application.

**242.** *See SEC v. Goren,* 272 F.Supp.2d 202, 214 (E.D.N.Y.2003) (reducing unitemized expense in receivership fee application by 50%, in recognition that some amount of that expense must have been reasonable).

Lead Plaintiffs.[243] "Such awards are not uncommon and can serve an important function in promoting class action settlements."[244] In making these awards, courts generally consider:

> the existence of special circumstances including the personal risk (if any) incurred by the plaintiff-applicant in becoming and continuing as a litigant, the time and effort expended by that plaintiff in assisting in the prosecution of the litigation or in bringing to bear added value (e.g., factual expertise), any other burdens sustained by that plaintiff in lending himself or herself to the prosecution of the claim, and, of course, the ultimate recovery.[245]

In addition, courts consider the relationship between the requested incentive award and the amounts recovered by absent class members under the settlement.[246]

Class Counsel have stated that Lead Plaintiffs were involved in settlement discussions, and, "while each of these individuals was in a position to capitalize on lawsuits already filed to attempt to get a full or at least far greater recovery for themselves [they] took seriously their role to arrive at a settlement in the best interest of the Class as a whole."[247] In light of Class Counsel's representations, I find that Lead Plaintiffs are entitled to a reasonable incentive award. The requested incentive award of $10,000 is comparable to incentive awards granted in other cases.[248] An award of $10,000 is also proportionate to the amount absent class members will recover under the settlement.[249]

## V. CONCLUSION

For the foregoing reasons, I hereby approve the proposed settlement as fair, reasonable and adequate, and certify the proposed class. Certification is solely for the purpose of settlement of the class claims against Jenkens. The joint motion of Jenkens and Lead Plaintiffs for entry of final judgment confirming the certification of the settlement class and approving the class settlement is granted. Class Counsel's motion for fees and expenses is granted to the extent stated above. The request of counsel for the Harslem Plaintiffs for fees and expenses is granted to the extent stated above. Lead Plaintiffs' request for an incentive award is granted. Objectors' requests to opt out of the class are denied. The Clerk of the Court is directed to close these motions [# s 173, 181, 187, 188].

SO ORDERED:

243. Lead Counsel Decl. ¶ 86.

244. *Sheppard v. Consol. Edison Co. of N.Y., Inc.,* No. 94 Civ. 0403, 2002 WL 2003206, 2002 U.S. Dist. LEXIS 16314 (S.D.N.Y. Aug. 1, 2002).

245. *Roberts v. Texaco, Inc.,* 979 F.Supp. 185, 200 (S.D.N.Y.1997).

246. *Sheppard,* 2002 WL 2003206 at *5–6, 2002 U.S. Dist. LEXIS 16314 at *17–20.

247. Lead Counsel Decl. ¶ 85.

248. *See Sheppard,* 2002 WL 2003206 at *6–7, 2002 U.S. Dist. LEXIS 16314 at *21–22 (citing cases approving incentive awards ranging from $336 to $303,000, with most awards being in the $10,000 to $50,000 range).

249. The settlement provides $81,557,805 for 1,076 class members, or roughly $65,000 per plaintiff, after counsels' fees, and making the unlikely assumption that all class members file a claim. The requested incentive award is thus roughly 15%, at most, of the average class recovery. *See Sheppard,* 2002 WL 2003206 at *6–7, 2002 U.S. Dist. LEXIS 16314 at *22–23 (approving as proportionate incentive awards $7,795 higher than the highest class payment of $21,372).